Mr. Justice CURTIS
dissenting.
I dissent from the opinion pronounced by the Chief Justice,” afid from the judgment which the majority of. the court'think it proper to render in this ■ case. The plaintiff alleged, in his declaration, that he was a citizen of the State of Missouri, and that the' defendant was a citizen of the State-of New York. ■ It "is not doubted that it was necessary to make each of these' allegations, to sustain the jurisdiction of the Circuit Court. The ■defendant denied, by a plea to the jurisdiction, either sufficient or;insufficient, that the- plaintiff was a citizen of the State of Missouri. The plaintiff' demurred to that plea.1 The Circuit' Court adjudged the plea insufficient, and the first questión for» our consideration is, whether the sufficiency of that plea is her - = fore this eourt-for judgment, upon this writ of error. The-part of the judicial power of the United States, conferred by • Congress. on the Circuit Courts, béing limited to certain de-. scribed cases and- controversies, the question whether a partic- • *565 ular case is within the cognizance of a Circuit Court, may be raised by a plea, to the jurisdiction of such court. "When that question has been raised, the Circuit. Court must, in the first instance, pass upon and determine.it. Whether its determination be final, or subject to review by this appellate court, must depend upon the will of Congress; upon which body the Constitution has conferred the power, with certain restrictions, to establish inferior courts, to determine their jurisdiction, and to regulate the appellate power of this court.. The twenty- ■ second section of the judiciary act of 1789, which allows a -writ of error from final judgments of Circuit Courts, provides that .there shall be no reversal in this court, on such writ of error, for error in ruling any plea in abatement, other than a. plea to the jurisdiction of the court. Accordingly it has'been ■ held, from the origin of the court to the present day, that Circuit Courts have not been made by Congress the final judges of their own jurisdiction in civil cases. And that when a record comes here upon a writ of error or appeal, and, on its inspection, it appears to this court that the Circuit Court had not jurisdiction, its judgment must be reversed, and the cause remanded, to be dismissed for want of jurisdiction.
It is alleged by the defendant in error, in this case, that the plea to the jurisdiction was a sufficient plea; that it shows, on' inspection of its allegations, confessed by the. demurrer, that the plaintiff was not a citizen of the State of Missouri; that upon this record, it must appear to this court that the case was not within the judicial power of the United States, as" defined and granted by the Constitution, because it was not a . suit by a citizen of one State' against a citizen of another State.
To this it is answered, first, that the defendant, by pleading .over,' after the plea to the jurisdiction1 was adjudged insufficient, finally waivéd all benefit of that plea.
When that plea was adjudged insufficient, the defendant, was obliged to answer over. He held no alternative. He could not stop the further progress of the’ case in.'the Circuit Court by a writ of error, on which the 'sufficiency of his plea to the jurisdiction could be tried in this court, because the judgment on that plea was not final, and no writ of error would. lie. He was forced to plead to the merits. It cannot be true, then, that he waived the benefit of his plea to the jurisdiction by answering over. Waiver includes consent. Here, there was no consent. And if the benefit of the plea was finally lost, it must be, not by any waiver, but' because the laws ol the United States have not provided any mode of reviewing the decision of the Circuit Court on such a plea, when that decision is against the defendant. This is not the *566 law. Whether the decision of the Circuit Court on a, plea to the jurisdiction be against the plaintiff, or against the defendant, the losing party may have any alleged error in law, in ■ ruling such a plea, examined in this court on a writ of error, when the matter in controversy exceeds the sum or value of two thousand dollars. If the decision be against the plaintiff, and his suit dismissed for want of jurisdiction, the judgment is technically final, and' he may at once sue out his writ of error. (Mollan v. Torrance, 9 Wheat., 537.) If the decision .be against the defendant, though he must answer over, and wait for a final judgment in the- cause, he may then have his writ of error, and upon it obtain the judgment of this court on any question of law apparent on the record, touching the jurisdiction. The fact that he pleaded over to the merits, under compulsion, can have no effect on his right to object to the jurisdiction. If this were not so, the condition of the two parties would be grossly unequal. Eor if a plea to the jurisdiction were ruled against the plaintiff, he could at once take his writ of error, and have the ruling reviewed here; while, if the same plea were ruled against the defendant, he must not only wait for a final judgment, but could in no event have the ruling of the Circuit Court upon the plea reviewed by this court. I know of no ground for saying that the laws of the United States have thus discriminated between'the parties to a suit in its courts.
It is further objected, that as the judgment of the Circuit Court was in favor of the defendant, and the writ of error in this cause was sued out by the plaintiff, the defendant is not in a condition to assign any error in the record, and therefore this court is precluded from considering the question whether the Circuit Court had jurisdiction.
• The practice.of this court does -not require a technical assignment of errors. (See the rule.) Upon a writ of error, the whole record is open for inspection; and if any error be found in it, the judgment is reversed. (Bank of U. S. v. Smith, 11 Wheat., 171.)
It is true, as a general rule, that the court will not allow a party to rely on anything as cause for reversing a judgment, which was for his advantage. In this, we follow an ancient rule of the common law. But so careful was that law of the preservation of the course of its courts, that it made an exception out of that general rule, and allowed a party to assign. for error that which was for his advantage, if it were a departure by the court itself from its settled course of procedure. The cases on this subject are collected in Bac. Ab., Error H. 4. And this court followed this practice in Capron v. Van Noor- *567 den, (2 Cranch, 126,) where the plaintiff below procured the reversal :of a judgment for the' defendant, on the ground that the plaintiff’s allegations of citizenship had not shown jurisdiction.
But it .is not necessary to determine whether the defendant can be allowed to assign want of jurisdiction as an error in a judgment in his own favor. The true question is, not what either of the parties may be allowed to do, but whether this court will affirm or reverse a judgment of the Circuit Court on the merits, when it appears on the record, by a plea to the jurisdiction, that it is a case to which the judicial pówer of the United Statés does not extend. The course of the court is, where no motion is made by either party, on its own motion, to reverse such a judgment for want of jurisdiction, not only in cases where it is shown, negatively, by a plea to the jurisdiction, that jurisdiction does not exist, but even where it does not appear, affirmatively, that it does exist. (Pequignot v. The Pennsylvania R. R. Co., 16 How., 104.) It acts upon the principle that the judicial power of the United States must not be exerted in a ease to which it does not extend, even if both parties desire to have it ’exerted. (Cutler v. Rae, 7 How., 729.) I consider, therefore, that when there was a plea to the jurisdiction of the Circuit Court in a case brought here by a writ ■'of error, the first duty of this court is, sua sponte, if not moved to it by either party, to examine the sufficiency of that plea; and thus to take care that neither the Circuit Court nor this court shall use the judicial power of the United States in a ease to which the Constitution and laws of the United States have not extended that power.
I proceed, therefore, to examine the plea to the jurisdiction.
I do not perceive any sound reason why it is not to be judged by the rules of the common law applicable to such pleas. It is true, where the jurisdiction of the Circuit-Court depends on the citizenship of -the. parties, it is incumbent on the plaintiff to allege on the record the necessary citizenship; but .when he has aohe so, the defendant must interpose’a plea in abatement, the allegations whereof show that the court has not jurisdiction; and it is incumbent on him to prove the truth of his plea.
In Sheppard v. Graves, (14 How., 27,) the- rules on this subject are thus stated in the opinion of the court: “That although, jn the courts’ of the United States, it is necessary to set forth the grounds of their cognizance as courts of limited jurisdiction, yet wherever jurisdiction shall be averred in the pleadings, in conformity with the laws creating those courts, ■it must be taken, prima-fade, as existing; and it is incumbent *568 ón bim wbo woi]ld impeach that jurisdiction for causes dehors the pleading, to allege and prove such causes.; that the necessity for the allegation, and the burden of sustaining it by proof, both rest upon the party talcing the1 exception.” . These positions are sustained by the.'authorities there cited, as well as by Wickliffe v. Owings, (17 How., 47.)
■■ When, therefore, as in this case, the necessary averments as to ‘ citizenship are made on the'record, and jurisdiction-is assumed to exist, and the' defendant comes by a plea to' the jurisdiction .to displace that presumption, he occupies, in my judgment, precisely the position described in Bacon Ab., Abatement: “Abatement, in the general acceptation of the word, signifies a plea, put in .by the'defendant, in which he. shows cause.to the court why he should not be impleaded; or, if at all, not in the manner and form he/now is.”
This being, then, a plea in abatement, to the jurisdiction of the court, I must judge of its sufficiency by those rules of the common .law applicable to such pleas.
. The plea wás as follows: “And the -said John E. A. Sand.-'. ford,, in-his own proper person, comes and says that this court ought not to have or take further cognizance of the action aforesaid, because he says that said cause of action,- and each and every of them, (if any-suck have accrued to the said Dred Scotty) .accrued to the said Dred. Scott oUt of the jurisdiction of this coart, and exclusively within "the jurisdiction ©f the courts of the State of Missouri; for that, to wit, the said plaintiff, Dred Scott, is not a citizen'.of the.. State of Missouri, ás Alleged, -in his declaration, because he' is a negro of African descent; his ancestors were of pure African1 blood, and were brought-into this country and sold as negro slaves, and thie the said Sandford is ready to verify. -Wherefore, he . prays judgment whether this court can or.will take further cognizance of the action aforesaid.” -,
■ .The plaintiff demurred, and the judgment of the Circuit Court was, that, the plea was insufficient.
I cannot treat-this plea as a general traverse of the,citizenship 'alleged 'by the plaintiff. Indeed, if it were so treated, the plea was clearly bad, for it concludes with a verification* and not to. the .country, as a general traverse should. And though this defect in a plea in bar must be pointed out by a special demur-, rer, it is never necessary to demur specially ‘to a plea in ijbate* . ment; all matters, though of form only,'may be takenadvantagé of upon a general demurrer to such- a plea. (Chitty on Pl., 465.)
.. The truth is, that though not drawn-with the utmost tech** Bical accuracy, it is a special traverse of the pláintiff’s allegation. *569 of "citizenship, and was a suitable and proper mode of traverse under, the' circumstances. By reference to Mr. Stephen’s description of the uses of such a traverse, contained in his excellent analysis of pleadings, (Steph. on Pl., 176,) it will be seen how precisely this plea meets one of his descriptions. No doubt the defendant might have traversed, by a common or general traverse, the plaintiff’s allegation that he was a citizen of the" State of Missouri, concluding to the country. The issue thus presented' beingjoined, would have involved matter of law, on which the jury must have passed, under the direction of the court. But by traversing the plaintiffs citizenship specially— that' is, averring those facts on which the defendant relied to show that in point of law the plaintiff was not a citizen, and basing the traverse on those facts as a deduction therefrom— opportunity was given to do, what was done; that is,'to present directly to the court, by a demurrer, the sufficiency of those facts to negative, in point of law, the plaintiff’s allegation of citizenship. This, then, being a special, and not a general" or common traverse, the rule is settled, that the facts thus set out in the plea, as the reason or ground of the traverse, must of themselves constitute, in point of law, a negative of the allegation thüs traversed. (Stephen on Pl., 183; Ch. on Pl., 620.) And upon a demurrer -to this plea, the question which arises is, whether the facts, that the plaintiff is a negro, of African descent, whose ancestors were of pure African blood, and were brought into this country and sold as negro slaves, may all be true, and yet the plaintiff be a citizen of the State of Missouri, within the meaning of the Constitution and laws of the United States, which confer on citizens of one State the right to sue citizens of another State in the Circuit Courts. Undoubtedly, if these facts, taken together, amount to an allegation that, at the time of action brought, the plaintiff was himself a slave, the plea is sufficient. It has been suggested that the plea, in legal effect, does so aver, because, if his .ancestors were sold as slaves, the presumption is they continued slaves; and if so, the presumption is, the plaintiff was born a slave; and if so, the presumption is, he continued to be a slave to the time of action brought.
.1 cannot think such presumptions can be resorted to, to help but defective averments in pleading; especially, in pleading in abatement, where the utmost certainty and precision are required. (Chitty on Pl., 457.) That the plaintiff himself was a,slaye at the time of action brought, is a substantive fact, having no; necessary connection with the fact that his parents were , sold as slaves. Éor they' might have been sold after he was born; or the plaintiff himself, if once a slave, might have *570 became a freeman before action brought. To aver that bis ancestors were sold as slaves, is not equivalent, in point of law, to, an averment that be was a slave.- If it were,'be could not even confess and avoid tbe averment of tbe slavery of bis an- ' cestors, wbicb -would be monstrous; and if it be not equivalent in point of law, it cannot be treated as amounting thereto when demurred to; for a 'demurrer confesses only those substantive fa'ets wbicb are well pleaded, and not other distinct substantive facts wbicb might be inferred therefrom by a jury. To.treat an,averménttbat tbe plaintiff’sancestórs were Africans, brought to this country and sold as slaves, as amounting to an ave,r-•meht on the record that ‘.be was a slave, because it may lay some foundation for. presuming so,-is to bold that tbe facts actually alleged may be treated as intended as: evidence of another distinct fact not alleged:- But it is a cardinal rule of pleading, laid down in Dowman’s case, (9 Rep., 9 b,) and in even earlier authorities therein referred to, “that evidence shall never be pleaded, for it only tends to prove matter of fact; ánd therefore tbe matter of "fact shall be pleaded.” Or, as tbe rule is> sometimes stated, pleadings must not be argumentative. (Stephen on Pleading, 384, and authorities cited ,by .bjm.) In Com. Dig., Pleader E. 3, and Bac. Abridgement, Pleas I, 5, and Stephen on PL, many decisions under this rule are collected. . In trover, for . an indenture whereby A granted a. manor, it is no plea that A did not grant the manor, for it-does not. answer the declaration except by argument. (Yelv., 223.)
■So in trespass for taking-and carrying .away the plaintiff’s goods, the defendant pleaded that the plaintiff never had any goods.'. -The court said, “this is an infallible argument'that the defendant is not guilty, but it is.no plea.” (Dyer, a 43.)
- In. ejectment, the defendant pleaded a surrender-of a copy-hold by the hand of Posset, the steward. The plaintiff replied, -that Posset was not steward. The court held this no issue, for it traversed the surrender only argumentatively. (Cro. Elis., 260.)
In these cases, and many- others reported in the books, the inferences from the facts stated were irresistible. But the court held they did not, when, demurred to, amount to such inferable facts. " In the casó at bar, the inference that the de- . fendánt was a slave at the time of action brought, even if it. can -be made at-all, from the fact that his-parents were slaves, is certainly not a necessary inference. This case, therefore, is like that of Digby v. Alexander, (8 Bing., 116.) In that case, the defendant pleaded many facts strongly tending tó show that he ...was oñceCEarl of Stirling; hut as there'was no. positive alie- *571 gation that be was so at tbe time of action brought, and as every fact averred might be true, and yet the defendant not have been Earl of Stirling at the time of action brought* the plea was held to be insufficient.
A lawful seizin of land is presumed to continue. But if, in an action of trespass quare clausum, the defendant were to plead that he was lawfully seized of the locus in quo, one month before the time of the alleged trespass, I should have no doubt it would be .a bad plea. (See Mollan v. Torrance, 9 Wheat., 537.) So if á plea to the jurisdiction, instead of alleging that the plaintiff was a citizen of the same State as the defendant, were to allege that the plaintiff’s ancestors were citizens of that State, I think the plea could not be supported. My judgment would be, as it is in this case, that if the defendant meant to aver a particular substantive fact, as existing at the time' of action brought, he must do it directly and explicitly, and not by way of inference from certain other averments, which are quite consistent with the contrary hypothesis. I cannot, therefore, treat this plea as containing an averment that the plaintiff himself was a slave at-the time of action brought; and the inquiry recurs, whether the facts, that he is of African descent, and that his parents were once slaves, are necessarily inconsistent with his own citizenship in the State of Missouri, within the meaning of the Constitution and laws of the United States.
, In Gassies v. Ballon, (6 Pet., 761,) the defendant was described on the record as a naturalized citizen of the United States, ■residing in Louisiana. The court held this equivalent to an averment that the defendant was a citizen of Louisiana; because a citizen of the United States, residing in any State of the Union, is, for purposes of jurisdiction, a citizen of that State. Now, the plea to the jurisdiction in this case does not controvert the fact that the plaintiff resided in Missouri at the date of the writ. If he did theffireside there, and was also a citizen of the United States, no provisions contained in the Constitution or laws of Missouri can deprive th'e plaintiff of his right to sue citizens of States other than Missouri, in the-courts of the United States.
' So that, under the allegations contained in this plea, and admitted by the demurrer, the question is, whether any person of African descent, whose ancestors were sold as slaves in the United States, can be a citizen of the United States. If any such person can be & citizen, this plaintiff has the right to the judgment of the court that he is so; for no cause is shown by the plea why he is not so, except his descent and the slavery of his ancestors.
The first section of the second article of the Constitution *572 uses the language,, “.a citizen of the United Státes at the time of the adoption, of the .Constitution.” ' One mode of approaching this question is, to inquire who were citizens of the United States at the time of the adoption of the Constitution,
• Citizens of the United States at the time of the adoption of the Constitution can have been no other than citizens of the United States under the Confederation. By the Articles of Confederation, a Government was organized, the style whereof was, “ The United States of America,” This Government was. in existence-when the Constitution was framed ,and proposed for adoption, and was to be superseded by the new Government of the United States of America, organized under the Constitution; When, therefore, the Constitution speaks. of citizenship of the United States, existing at the time of the -adoption of the Constitution, it must necessarily refer to citizenship under the Government which existed prior to and at the time of such adoption.
■ Without going into any question concerning the powers of the Confederation to govern the territory,of the United.States out of the limits of the States, and consequently to sustain the relation.of Government'and citizen.in respeet to the inhabitants of such territory, it may safely he said that the citizens of the several States were citizens of the United States under the Confederation.
■ That Government, was simply a confederacy, of the several States, possessing a few defined powers over subjects of general concern, each State retaining every power, jurisdiction, and right, not expressly delegated to the United States in Congress assembled. And no power was thus delegated to the Government of the Confederation, to act on any question, of citizenship, or to make any rules in respect thereto.- The whole matter wás left to stand upon the action of the several States, and to the natural conseqhence of such action, that the citizens of each State should he citizens of that Confederacy into which that State had entered, the style whereof, was* “The United States of America.”
To determine whether any free persons, descended from Africans held in slavery, were Citizens of-the United States under the Confederation, and consequently at the time of the adoption of the- Constitution of the United States, it is only necessary to know whether any such persons were citizens of either of the States under the Confederation, at the time of the adoption of the Constitution. .
Of this there can be no doubt. At the time of the ratification of the Articles of Confederation, all free native-born inhabitants of the States of New Hampshire,- Massachusetts, New *573 York, New Jersey, and North Carolina, though descended from African slaves, were not only citizens of those States, hut such of them as had the other necessary qualifications pofesess-ed the franchise of electors, on'equal terms with other citizens.
The Supreme Court of North Carolina, in the case of the State v. Manuel, (4 Dev. and Bat., 20,) has declared the law of that State on this subject, in terms which I believe to be as sound law in the other States I have enumerated, as it was in North Carolina.
“According to the laws of this State,’-’ says Judge Gaston., in delivering the opinion of the court, “all human beings within it, who are not slaves, fall within one of two classes. Whatever distinctions may have existed in the. Roman laws between citizens and''free inhabitants, they are unknown to our institutions. Before our Revolution, all free persons born within the dominions of the King of Great Britain, whatever their color of complexion, were native-born British subjects— those, born out of his allegiance were aliens. Slavery did not exist in England, but it aid in the British colonies; Slaves were not in legal parlance persons, but property. The moment •the incapacity, the disqualification of slavery, was removed, they became ,persons, and were then either British subjects, qr not British subjects, according as they were or were not born within the allegiance of'the British King. TJpon the Revolution, no other ehange took place in the laws of North Carolina than was consequent on the transition from a colony dependent on a European King, to a free and sovereign State. Slaves remained slaves. British subjects in- North Carolina became North Carolina freemen. Foreigners, until made members-of the' State, remained aliens. Slaves, manumitted here,-became freemen, and therefore, if born within . North Carolina, are citizens of North Carolina, and all free persons born within the State are born citizens of the State! The Constitution' extended the elective franchise'to every, freeman who had arrived at the age of twenty-one, and paid a public tax; and it is a ,matter of universal notoriety, that, under it, free persons, without regard to color, claimed and exercised the franchise, until it was taken from free men of color a few years since by our amended Constitution.”
- In the State v. Newcomb, (5 Iredell’s R., 253,) decided in 1844, the same court referred to this casé of the State v. Manuel, and said: “That case underwent a very laborious investigation, both by the bar and the bench. The case was brought here by appeal, and was felt to be. one of great importance in principle. It was considered with an anxiety, and care worthy of the .principle involved, and which give it a control *574 ling influence and. authority on all questions of a. similar character.”
An argument from speculative premises, however well cho.sen, that the then t state of opinion in the Commonwealth of Massachusetts was not consistent with the natural rights of people of color who were born pn that soil, and that they were not* by the Constitution of 1780 of that State, admitted to the condition of citizens, would be -received with surprise by the people of that State, who know their own political history. . It is true, beyond all controversy, that persons of eolqr, descended from African slaves, were by that Constitution made citizens •of the State; and such of them as have had the necessary qualifications, have held and exercised the elective franchise, as ' citizens, from that time to the present. (See Com. v. Aves, 18 Pick. R., 210.)
) The Constitution of 'New Hampshire conferred the elective franchise, upon “every inhabitant of the State having the necessary qualifications,” of which color or descent-was not one.
■ The Constitution of New‘York gave the right to voté to “every male ¡inhabitant, whó shall" have resided1,” &c.; making no. discrimination between free colored persons and others. (See Con. of N. Y., Art. 2, Rev. Stats. of N. Y., vol. 1, p. 126.)
That of New- Jersey, to “all inhabitants of. this colony, of full age, who' áre worth £50 proclamation money, clear estate.” ■
New York, by its Constitution of 1820, required colored persons to havé,some qualifications as prerequisites for voting, which white persons need not possess. And New- Jersey,' by. its present Constitution, restricts the right to vote to white male citizens! Rut these changes' can have no other effect upon the present inquiry, except to show, that before they were made, no such restrictions existed; and- colored in corn-mop with white persons, were- not only citizens of those States, • but entitled to the elective franchise on the samé qualifications as white persons, as they now are in New Hampshire and Massachusetts. I shall not enter into an examination of the' existing opinions.- of that period respecting the African race, < nor into any discussion concerning the meaning of those who asserted, in the JC>eclafatión of Independence, that all men.'are created equal; that they are endowed by their- Creator with ; certain inalienable rights; that among these are life; liberty, and the pursuit of happiness. ' My own opinion is,-that a cáíín comparison of these assertions of universal abstract truths,-iand of their own individual opinions and acts,’ would not leave *575 ' these men tinder any reproach of inconsistency; that the great truths they asserted on that solemn occasion, they were ready and anxious to make effectual, wherever a. necessary regard to circumstanbes, which no statesman can disregard without producing more evil than good, would allow; and that it would not be just to them, nor true'in itself, to allege that they intended to say that the Creator of all men had endowed the white race, exclusively, with the great natural rights which the' Declaration of Independence asserts. But this is not the place to vindicate their memory. As I conceive, we should deal Here, not with such disputes, if there can Jbe a dispute concerning this subject, but with those substantial facts evinced by the written Constitutions of States, and by the notorious practice under .them. And they show, in a manner which no •argument can obscure, that in some the original thirteen States, free colored persons, before and at the time of the formation of the Conptitution; were citizens of those States.
The fourth of the fundamental articles of the Confederation was as follows: “ The free inhabitants of each of these States," paupers, vagabonds, and fugitives from justice, excepted, shall be entitled to all the privileges and immunities of free citizens in the several States.”
The fact that free persons of color were citizens .of some of the seveml States, and the consequence, that this fourth article of the Confederation would have the effect to confer on such' persons the privileges and immunities of general citizenship, were not only known to those who framed and adopte'd those. articles, but the evidence is decisive, that the fourth article was intended to have that effect, and' that more restricted language, which would have'' excluded such persons, was deliberately and purposely rejected.
' On the 25th of June, 1-778, the Articles of Confederation being under consideration by the Congress, the delegates from South Carolina moved to amend this fourth _ article, by inserting after the \yord “free,” and before the word “inhabitants,” the word “white,” so that the privileges and immunities of General citizenship would be secured only to white persons. 'wo States voted for the amendment, eight States against it, and the vote of one State was divided. The language of the article stood unchanged, and both by, its terms of inclusion, “free inhabitants,” and the!strong implication from its terms of exclusion, “paupers, vagabonds, and-fugitives from justice,’.’ Who alone were excepted, it is-clear, that under the Confederation, and at the time of the adoption of the Constitution, free colored persons of African descent might be, and, by reason of their citizenship in certain States, Were entitled to the *576 privileges and immunities of general citizenship of the United States. .
Did the Constitution-of the United States deprive them' or their descendants of citizenship ?
That Constitution was .ordained and established by the people of the United States, through the action, in each State, of those persons who were qualified by its laws to act thereon, in behalf of themselves and all other citizens of that State. In some of the States, as we have seen, colored persons were among those qualified by law to act on this subject. These colored persons were not only included in the body of “the people of the United States,” by whom the Constitution was ordained and established, but in at least five of the States they had the-power to act, and doubtless did act, by their suffrages, -upon the question of its adoption. It would be strange, if we ^were to find in that instrument anything which deprived of their citizenship any part of the people of the United States Who Were among those by whom it was established. •
I can find nothing in the Constitution which, proprio vigore, deprives of their citizenship any class of persons who were citizens of the United States at the time of its adoption, or who should be native-born citizens of any State after its adoption; nor any power enabling Congress to disfranchise persons bom on the soil of any State, and entitled to citizenship of such State by its Constitution and laws. And my opinion is, that,' .under the Constitution of the United States, every free person born on the soil of a State, who is a citizen of that State by force of its Constitution or laws, is also a citizen of the United "States.
I will proceed to state' the grounds of that opinion.
.The first section of the second article of the Constitution •uses the-language, “a naturahbom citizen.” It thus assumes that citizenship may be acquired by birth. Undoubtedly, this language of the ‘Constitution' was used in reference to that principle of public law, well understood in this country at the time of the adoption of the Constitution, which referred citizenship to the place of birth. At the Declaration of Independence, and ever since, the. received general doctrine has been, in conformity "with the common law, that free persons bom .within either of the colonies were subjects of the King; that by the Declaration of Independence, and the consequent acquisition of sovereignly by the several States, all such persons ceased to be subjects, and became citizens of the several.States, except so far as some of them were disfranchised by the legislative power of the States, or availed themselves, seasonably, of the right to adhere to the British Crown in the civil contest, *577 and thus to continue British subjects. (McIlvain v. Coxe’s Lessee, 4 Cranch, 209; Inglis v. Sailors’ Snug Harbor, 3 Peters, p. 99; Shanks v. Dupont, Ibid, p. 242.)
The Constitution having recognised the rule that' persons horn within the several States .are citizens of the United States, one of four things must be true:
First. That the Constitution itself has described what 'native-born persons shall or shall • not be citizens of the United States; or,
Second. That it has empowered Congress to do so; or,
Third. That all free persons, born within the several States, are citizens of the United States; or,
Fourth. That it is left to each State to determine what free persons, rbom within its limits, shall be citizens of such State, and thereby be citizens of the United States.
. If there be such a thing as citizenship of the United States acquired by birth within the States, which the Constitution expressly recognises, and no one denies, then these four alternatives embrace the entire subject, and it only remains to’ select that one which is true.
That the Constitution itself has defined citizenship of the United States by declaring what persons, born within the several States, shall or shall not be citizens of the United States,, will not be pretended. It contains no such declaration. We may dismiss the first alternative, as without doubt unfounded.
Has it empowered Congress to enact what free persons, born within the several States, shali of shall not be citizens of the United States'?
Before examining the various provisions of the Constitution which may relate to this question, it is important to consider for a moment the substantial nature, of this inquiry. It is, in effect, whether the • Constitution has empowered Congress to create privilegéd classes within the States; who alone can be entitled to the franchises and powers of citizenship of the United States. If it be admitted that the Constitution has enabled Congress to declare what free persons, bom within the several States, shall be citizens of the United States, it must at the same time be admitted that it is an unlimited power.. If this subject is' within1 the control of Congress, it' must depend wholly on .its discretion. Eor, certainly, no limits of that discretion can be found in the Constitution; which is wholly silent concerning it; and the necessary consequence is, that the Federal Government may select classes of- persons within the several States who alone can be entitled to the political privileges of citizenship of the United'States. If this power exists, what persons born within the States may be President or Vice Pres? *578 3dent of the United States, or members of either House of Congress, or bold- any office or enjoy any privilege -whereof citizenship of the United States is a necessary qualification, must depend solely on the will of Congress. By virtue of it, though Congress can grant no title of nobility, they may create an oligarchy, in whose hands would be concentrated the entire power of the Federal Government.
It is a substantive power, distinct in its nature from all others; capable of affecting not only the relations of the States to the General Government, but of controlling the political condition of the people of the United States., Certainly we ought to find this power granted by the Constitution, at least by some necessary inference, before we can say it does not remain to the States or the people. I proceed therefore to examine all the provisions of the Constitution which may have some bearing on this subject.
Among the powers expressly granted to Congress is. “the power'to establish a uniform rule of naturalization.” It is not doubted that this is a power to prescribe a-rule for the removal of the disabilities consequent on foreign birth. To hold that it extends further than this, would do violence to the meaning of the term naturalization, fixed in the common-law, (Co. Lit., 8 a, 129 a; 2 Ves., sen., 286; 2 Bl. Com., 293,) and in the minds of those who concurred in framing and adopting the Constitution. It was in this sense of conferring on an alien and his issue the rights and powers of a native-born citizen, that it was (employed in the Declaration- of Independence. It was in this •sense it was expounded in the Federalist, (No. 42,) has been understood by Congress, by the Judiciary, (2 Wheat., 259, 269; 3 Wash. R., 313, 322; 12 Wheat., 277,) and by commentators on the Constitution. (3 Story’s Com. on Con., 1—3; 1 Rawle on Con., 84—88; 1 Tucker’s Bl. Com. App., 255—259.)
It appears, then, that the only power expressly granted to 'Congress to legislate concerning citizenship, is confined to the removal of the disabilities of foreign birth.
"Whether there be anything in the Constitution from which ¡a broader power may be implied, will best be seen when we •some to examine the two other alternatives; which are, whether all free persons, born on the soil of the several States, or only such of them as may be citizens of each State, respectively, are thereby citizens of the United States.. The last of these alternatives, in my judgment, contains the truth. .
'' Undoubtedly, as has already been said, it is a principle of public law, recognised by the Constitution itself, that birth on the soil of a country both creates the duties and confers the rights -of citizenship. But it must be remembered, that though *579 the Constitution was to form a Government, ana under it the United States of America were to be one united sovereign nation, to which loyalty and obedience on the one side, and from which- protection and privileges on the other, would be due, yet- the several sovereign States, whose people were then citizens, - were not only to continue in existence, but with powers unimpaired, except so far as they were granted by the people to the National Government.
Among the powers unquestionably possessed by the several States, was that of determining what persons should and whgt persons should not be citizens. It was practicable to confer on the Government of the Union this entire power. It embraced what may,1 well enough for the purpose nowin view, be divided into three parts. ,Mrst: The power to remove the .disabilities of alienage, either by special acts in reference to each individual case, or by establishing a rule of naturalization to be administered and applied by the courts. Second: Determining what persons,should enjoy the privileges of citizenship, in respect to the internal affairs of the several States. Third! What native-born • persons should be citizens of the United States. '' _ .
■. The first-named power, that of establishing a uniform rulé of naturalization, was granted; and here the grant, according to its terms, stopped. Construing a, Constitution containing . only limited and defined powers of government, the argument derived from this definite and restricted power to establish a rule of naturalization, must be admitted to be .-exceedingly strong. I do not say it is necessarily decisive. It might be controlled by other parts of the Constitution. But wheh this particular subject of citizenship was under consideration, and, in the clause specially intended to define the extent of power concerning it, we find a particular part of this entire power separated from' the residue, and conferred on the General Government, there arises a strong presumption that this is all which is granted, and that the residue is left, to the States and to the people". And this presumption is,' in my opinion, converted into a certainty, by an examination of all such other clauses of the Constitution as touch this subject. '
I will examine each which can have any possible bearing on this question.
The first clause of the second section of the third article of the Constitution is, “The judicial power shall extend to controversies between a State ,and citizens of another State; between citizens of different States; between citizens of the same' State, claiming lands under grants of different States; and between States, or the citizens thereof, and foreign States, *580 citizens, or subjects.” . I do not think this clause has any considerable bearing upon the particular inquiry now under consideration. Its purpose was, to extend the judicial power to -those controversies into which local feelings or interests might so enter as to disturb the course of Justice, or give rise to suspicions that they had done so, and thus possibly give occasion to jealousy or ill will between different States, or a particular State and a foreign nation.. At the same time, 1 would remark, in passing, that it has never been held, I do not know that it has ever been supposed, that any citizen of a State could bring himself under this clause and the eleventh and twelfth sections of the judiciary act of 1789, passed in pursuance of it, who was not a citizen of the United States. But I have referred to the clause, only because it is one of the places where citizenship is mentioned by the Constitution. Whether it is entitled to any weight in this inquiry or not, it refers only to citizenship of the several States; it recognises that;' but it does not recognise citizenship of the United States as something distinct, therefrom.
As has been said, the purpose of this clause did not necessarily connect.it with citizenship of the United States, evén if that were something distinct from citizenship of the several States, in the contemplation of the Constitution. This cannot be said of other clauses of the Constitution, which I now proceed to refer to.
■ “The citizens of each State shall be entitled to all the privileges, and immunities of citizens of the several States.” Nowhere else in the Constitution, is-there anything concerning a.general citizenship; but here, privileges and immunities to be enjoyed throughout 'the United States, under and by force of the national compact, are granted and secured. In selecting those, who.- are to enjoy these national rights of citizenship, howare they described? As citizens of each State. It is to them these national rights' are secured. The qualification for them is not to be looked for in any provision of the Constitution or laws. of. the. United States. They are to be citizens of the several States, and, as such, the privileges and immunities of general.citizenship,, derived from and guarantied by the Constitution, áre to be enjoyed by them. It would seem thát if it had been intended to constitute a class of native-born persons within the States,, who should derive their citizenship of the United States from the action of the Federal Government; this, was an occasion for referring to them. It cannot be supposed that it was the purpose of this article to confer the privileges and immunities of citizens in all the States upon persons not citizens of the United States.
*581 And if it was intended to secure these rights only to citizens of the United States, how has the Constitution here described such persons ? Simply as citizens of1 each State.
But, further: though, as I shall presently more fully state, I do not think the enjoyment of the elective franchise essential to citizenship, there can be no doubt it is One of the chiefest attributes of citizenship under the American' Constitutions; and the just and constitutional possession of this right is decisive evidence of citizenship. The provisions madé by a Constitution on this subject-must therefore -be looked to 'as bearing directly on the question what persons are citizens under that Constitution ; and as being decisive, to this extent, that all such persons as are allowed by the Constitution to exercise the elective franchise, and thus to participate in the Govern- r ment of the United States, must be deemed citizens of the' United States. '
Here, again, the consideration presses itself upon us, that if there was designed to be a particular class of native-born persons within the States, deriving their citizenship from the' Constitution and laws of the United States, they should at least have been referred to as those by whom the President1 and House of Representatives were to be elected, and to whom they should be responsible. '
' Instead of that, we again find this subject referred to' the laws of the several States. The electors of President are to be appointed in such manner as the Legislature of each State, may direct, ‘ and the qualifications of electors of members of the House of Representatives shall be the same as for electors of the most numerous branch of the State Legislature.
„ Laying aside, then, the case of aliens, concerning which the Constitution of the United States has provided, and confining our view to free persons bóm within the several State?, we. find that the Constitution has recognised the general principle of public law, that allegiance and citizenship depend' on the place ’of birth; that it has not attempted practically to apply this. ■ principle by designating the particular classes of persons who should or should not come under it; that when we turn to the Constitution for an answer to the question, what free persons, born within the several States, are citizens of the United States, the only answer we can receive from any of its express provisions is, the citizens of the several States are to' enjoy the privileges and immunities of citizens in every State, and their franchise as electors under the Constitution depends bn their citizenship in the several States. Add to this, that the Constitution was ordained by the citizens of the several States; that they were “the people of the United States,” for whom *582 ' and whose posterity the Government was declared in the preamble of the Constitution to be made; that each of them was “a citizen of the United States at the time of the adoption of the Constitution,” within the meaning of those words in that instrument; that by them the Government was to be and was in fact organized; and that no power is conferred on the Government of the '-Union to discriminate between them, or to disfranchise any of them — the necessary conclusion is, that those persons born within the several States, who, by force of their respective Constitutions and laws, are citizens of - the State, are thereby citizens of the United States.
It may be proper here to notice some supposed objections to this view of the subject.
It has been often asserted that the Constitution was made exclusively by and for the white race. It has already been shown thatfin five of the thirteen original States, colored persons then possessed the elective franchise, and were among fihfiffA hvwTlíYm ■fiVíA f'írmafít.n+.írm w«.a nWlsnnorl q.tw-1 N exclusively for the white race is, in my opinion, not only an assumption not warranted by anything in the Constitution, but contradicted by its opening declaration, that it was ordained and established by the people of the United States, for themselves and their posterity. - AncJ/ás free colored persons were then citizens of at least five States^ and so in every sense part ,of the people of the United States, .they- were among those for whom and whose posterity the Constitution was ordained and' established/)»
Again, it has been objected, that if the Constitution has left to the several States the rightful power to determine who of their inhabitants shall be citizens of the United States, the States may make aliens citizens.
The answer is obvious. The Constitution has left to the States the determination what persons, born within their respective limits,- shall acquire by birth citizenship of the United States; it has not left to them any power to prescribe any rule for the removal of the disabilities of alienage. This power is exclusively in Congress.
It has been further objected, that if free colored persons, born within a particular State, and made citizens of that State by its Constitution and laws, are thereby made citizens , of the United States, then, under the second section of the fourth article of the Constitution, such persons would be entitled to all the privileges and immunities of citizens in the several States; and if so, then colored persons eould vote, and be *583 eligible to not only Federal offices, but offices even in those States whose Constitutions and laws disqualify colored persons from voting or being elected to office.
But this position rests upon an assumption which I deem untenable. Its basis is, that no one can be deemed a citizen of the TJnited States who is not entitled to enjoy all the privileges and franchises which are conferred on any citizen. (See 1 Lit. Kentucky R., 326.) That this is not true, under the Constitution of the TJnited States, seems to me clear.
A naturalized citizen, cannot be President of the TJnited States, nor a Senator till after the lapse of nine years, nor a Representative till after the lapse of seven years, from his naturalization. Yet, as" soon as naturalized, he is certainly a citizen of the TJnited States. Nor is any inhabitant of the District of Columbia, or of either of the Territories,,eligible to the office of Senator or Representative in Congress, though they may be citizens of the TJnited States. So, in all the States, numerous persons, though citizens, cannot vote, or cannot hold office, either on account of their age, or sex, or the want of the necessary legal qualifications. The truth is, that citizenship, under the Constitution of the TJnited States,' is not dependent on the possession of any particular political or even of all civil rights; and any attempt so to define it must lead to error. To what citizens the elective franchise shall be confided, is a question to be determined 'by each State, in accordance with its own views of the necessities or expediencies of its condition. What civil rights shall be enjoyed by its citizens, and whether all shall enjoy the same, or how they may be gained or lost, are to be determined in the same way.
One may confine the right of suffrage to white male citizens; another may extend it to colored persons and females; one may allow all persons above a prescribed age to convey property and transact business; another may exclude married women. But<whether native-born women, or persons under age, or under guardianship because insane or spendthrifts, be excluded from voting or holding office, or allowed to do so, I apprehend no one will deny that they are citizens of the TJnited States. Besides, this clause of the Constitution does not confer on the citizens of one State, in all other States, specific and enumerated privileges and immunities. They are entitled to such as belong to citizenship, but rot to such as belong to particular citizens attended by other qualifications. Privileges and immunities which belong to certain.citizens of a State, by reasofn of the operation of causes other than mere citizenship, are not conferred. Thus, if the laws of a State require, in addition, to *584 citizenship of the State, some qualification for 'office, or the exercise of the elective franchise, citizens of all other States, coming thither to' reside, and not possessing those qualifications, cannot enjoy those privileges, not because they are not to be deemed entitled to the privileges of citizens of the State • in which they’ reside, but because they, in common with the native-born citizens of that State, must have the qualifications prescribed by law for the enjoyment of such privileges, under its Constitution and laws. Tt rests with the States .themselves so to frame their Constitutions and laws as. not to attach a particular privilege or-immunity to mere naked citizenship. If one of the States will, not deny to any of its own citizens a particular privilege or immunity, if it confer it on all of them by reason of mere naked citizenship, then it may be claimed by every citizen of each State by force of the Constitution; and it must be borne in mind, that the difficulties which attend the allowance of the claims of colored persons to be citizens of the United States are not avoided by saying that, though each State may make them its citizens, they are not thereby made citizens of the United States, because the privileges of general citizenship are secured to the citizens of each State. The language of the Constitution is,'“ The citizens of each' State, shall be entitled to all privileges and immunities of citizens in the several States.” If each State may make such persons its citizens, they become, as such, entitled to the benefits of this article, if there be a native-born citizenship of. the United States distinct from a native-born citizenship of the several States.
There is one view of this article entitled to consideration in this connection. It is manifestly copied from the fourth of the Articles of Confederation, with only slight changes of phrase-' ology, which render its meaning more precise, and dropping the clause which excluded paupers, vagabonds, and fugitives from justice, probably because these cases could be dealt with under the police powers of the States, and a special provision therefor was not necessary. It has been suggested, that in adopting it into the Constitution, the.words “free.inhabitants” were changed for the word “citizens.” An examination of the forms of expression commonly used in the State papers of that day, and an attention to the substance of this article of the' Confederation, will show that the ’words “free inhabitants,” as then used, were "synonymous-with citizens. When the' Articles of Confederation were adopted, we were in the midst of the war of the Revolution, and there were Very few persons then embraced in the words “free'inhabitants,” who were not born on our soil. It was not a time when many, save the *585 children of the soil, were willing to embark their fortunes in onr cause; and though there might he an inaccuracy in the uses of words to call free inhabitants citizens, it was then a technical rather than a substantial difference. If we look into the Constitutions and State papers of that period, we find the inhabitants or people of these colonies, or the inhabitants of . this State, or Commonwealth, employed to designate those whom wre should now denominate citizens. The- substance and purpose of the article prove it was in this sense it used these words: it secures to. thé free inhabitants of each State the privileges and immunities of free citizens in every State. It is not conceivable that the States should have agreed to extend the privileges of citizenship to persons not entitled to, enjoy the privileges of citizens in the States where they dwelt; that under this article there was a class of persons in some of the States, not' citizens, to whom were secured all the privileges and immunities of citizens when they went into other Stafes; and the just conclusion is, that though the Constitution cured an inaccuracy of language, it left the substance of this article in the Rational Constitution the same as it was in the Articles of Confederation.
The history of this fourth' article, respecting the attempt to exclude free pérsons of color from its operation, has been already stated. It is reasonable to conclude that this history was known to those who framed and adopted the Constitution. . That under this fourth article of the Confederation, free persons of color might be entitled to the privileges of general citizenship, if otherwise entitled thereto, is clear. When this article was, in substance, placed in and made part of the Constitution of. the United States, with fio change in' its language calculated to exclude free colored persons from the benefit of its provisions, the presumption is, to say the least, strong, that the practical effect which .it was designed to have, and did have, under the former Government, it was designed to have, and should have, under the new Government.
It may be further objected, that if free colored persons may he citizens of the United- States, it depends only on the will of a master whether he will emancipate his slave, and thereby make him a citizen. Rot so. The master is subject to the will of the State. Whether he shall be allowed to emancipate his slave at all; if so, ;on what conditions; and what is to be the political status of the freed man, depend, not. on the will of the master, but on the will of the State, upon which the political status of all its native-born inhabitants depends. Under the Constitution of the United States, each State has retained this power of determining .the political status of its na *586 tive-born inhabitants, and no exception thereto can be found •in the Constitution. And if a master in a slaveholding State should carry.his slave into a free State, and there emancipate him, he would not thereby make him a native-born citizen of that State, and consequently no privileges could be claimed by such' emancipated slave as a citizen of the United States. For, whatever powers the States' may exercise to confer privileges of citizenship on persons not born on their soil, the Constitution "of the United States-does not recognise such citizens. As has already been said, it recognises the great principle of public law, that allegiance and^citizenship spring , from the place of birth.. It leaves to the States the application of that principle to individual eases'. It secured to the citizens of each State the privileges'and immunities of citizens in every other State. But it does not allow to the States the power to make aliens citizens, or-permit one State to take persons born on the soil of another State, and, contrary to the laws and policy of the State where'they were born, make them its citizens, and so citizens of the United States. hTo such deviation from the great rule ..of public law was contemplated by the Constitution ; and when any such attempt shall be actually made, it is to be met by applying to it those rules of law and those principles of good faith which will be sufficient to decide it, and not, in my judgment, by denying that all the free, native-born inhabitants of a State, who are its citizens under its Con-, stitution and laws, are also citizens of the United States.
It has sometimes been urged that colored persons are shown not to be citizens of the United States" by the fact that the naturalization laws apply only to white persons. But whether a person born in the United States be or be not a citizen, cannot depend on laws which refer only to aliens, and do not affect the status of persons born in the United States. The utmost effect which can be attributed to them is; to- show that-Congress" has not deemed it expedient generally to apply the rule to colored aliens. That, they might do so, if- thought fit, is clear. The Constitution has not excluded them. And since. that has conferred the power on Congress to naturalize colored aliens, it certainly shows color is not a necessary qualification for citizenship under the Constitution of the United States. It may be added, that the power to make colored persons citizens of the United States, under the Constitution, has been actually exercised in repeated and important instances. (See the Treaties with the Choctaws, of September 27, 1830, art. 14; with, the Cherokees, of May. 23, 1836, art. 12; Treaty of Guadalupe Hidalgo, February 2, 1848, art. 8.)
I do not deem it necessary to review at length the legisla *587 tion of Congress having more or less bearing on the citizén-sbip of colored persons. It does not seem to me to have any considerable tendency to prove that it has been considered by the legislative department of'the Government, that no such persons are citizens of the United States. Undoubtedly they have been debarred from the exercise of particular rights or privileges extended to white persons, hut, I.believe, always in terms which, by implication, admit they may be citizens. Thus the. act of May 17, 1792, for the organization of the militia, directs the enrolment of “every free, able-bodied, white-male citizen.” An assumption that none hut white persons are citzens, would he as inconsistent with the just import of this language, as that all citizens are able-bodied, or males. •
So the act of Eebruary 28, 1803, (2 Stat. at Large, 205,) to prevent the importation of certain persons into States, when by the laws thereof their admission is prohibited, in its first section forbids all masters of vessels to import or bring “ any negro, mulatto, or other person of color, not being a native, a citizen, or registered seaman of the United States,” &e. .
The acts of March 3, 1813, section 1, (2 Stat. at Large, 809,) and March 1, 1817, section 3, (3 Stat. at Large, 351,) concerning seamen, certainly imply there may be persons or color, natives of the United States, who are not citizens of the United States. This implication is undoubtedly in accordance with the fact. For not only slaves, but free persons of color, born in some of the States, are not citizens. But there is nothing in these laws inconsistent with the citizenship of persons of color in others of the States, nor with their being citizens of the United States.
Whether much or little weight should be attached to the particular phraseology of these and other laws, which were not passed with any direct reference to this subject, I consider their tendency to be, as already indicated, to show that, in the apprehension of their framers, color was not a necessary qualification of citizenship. It would be strange, if laws were found on our statute book to that effect, when, by solemn treaties, large bodies'of Mexican and ÍTorth American Indians as well as free colored inhabitants of Louisiana have been admitted to citizenship of the United States.
In the legislative debates which preceded the admission of' the State of Missouri into the Union, this question was agitated. .Its result is found in the resolution of Congress, of March 5,1821, for the admission of that State into the Union. The . Constitution of Missouri, under which that State applied for admission into the Union, provided, that it should be tbe duty . *588 of the Legislature “ to pass laws to prevent free negroes and mulattoos from coming to land settling in the State, under any pretext whatever.” One ground of objection to the admission of the State under this Constitution was, that it would require the Legislature to exclude free persons of color, who would be entitled, under the second section of the fourth article of the Constitution, not only to come within the State, hut to enjoy there the privileges and immunities of citizens. The resolution of Congress admitting the State was upon the fundamental condition, “that the Constitution of Missouri shall never .be construed to authorize the passage of any law, and that no law shall be passed in conformity thereto, by which any citizen of either of the States of this Union shall be excluded from the enjoyment of any of the privileges and immunities to which such citizen is entitled under the Constitution of the United States.” It is true, that neither this legislative declaration, nor anything in the Constitution or laws of Missouri, could confer or take away any privilege or immunity granted by the Constitution. But it is also true, that it expresses the then conviction of the legislative power of the United States, that free negroes, as citizens of some of the States, might he entitled to the privileges and immunities of citizens in all the States.
The conclusions at which I have arrived on this part of the case are: 1
' First. That the free native-born citizens of each State are citizens of the United States.
Second. That as free colored persons born within some of the States are citizens of those States, such persons are also citizens of the United States.
Third. That every such citizen, residing in any State, has the right to sue and is liable to be sued in the Federal courts, as' a citizen of that State in which he resides.
Fourth.' That as the plea to the jurisdiction in this case shows no facts, except that the plaintiff was of African descent, and his ancestors were sold as slaves, and as these facts are nót in- ■ consistent with his citizenship of the United States, and his residence in the State of Missouri, the plea to the jurisdiction was bad, and the judgmeht of the Circuit Court overruling it was correct,
. I dissent, therefore, from that part of the opinion of the majority of the court, in which it is held that a person of African descent cannot be a citizen of the United States; and I regret I must go further, and dissent.both from what I deem tneir assumption of authority to examine the constitutionality of the act of Congress commonly called the Missouri compre» *589 mise act, and the grounds- and conclusions announced in their opinion.
Having first decided that they were hound to consider the sufficiency of the plea to the jurisdiction of the Circuit Court, and having decided that this plea showed that the Circuit Coui’t.had not jurisdiction, and consequently that this is a case to which the judicial power of the United States does not extend, they have gone on to examine the merits of the case as they appeared on the trial before the court and jury, on the issues joined on the pleas in bar, and so have reached the question of the power of Congress to pass the act of 1820. On so grave a subject as this, I feel obliged to say that, in my opin-ión,' such an exertion of judicial power transcends the limits of the authority of the court, as described by its repeated decisions, and, as I understand, acknowledged in this opinion of the majority of the court.
In the course of that opinion, it became necessary to comment on the ease of Legrand v. Darnall, (reported in 2 Peters’s R., 664.) In that case, a bill was filed, by one alleged to be a citizen of Maryland, against one alleged to be a citizen of Pennsylvania. .The bill stated that the defendant was the son of a white man by one of his slaves; and that the defendant’s father devised to him certain lands, the title .to which was put in controversy by the bill. These facts were admitted in the answer, and upon these and other facts the court made its decree, founded on the principle that a devise of land by a master to a . slave, was by implication also a bequest of his freedom. The .facts that the defendant was of African descent, and was born a slave,-were not only before the court, but entered into the entire substance of its inquiries. The opinion of the majority Of my brethren in this case disposes of the case of Legrand v.. Darnall, by saying, among other .things, that as the fact that the defendant was born a slave only came before this court on the bill and answer, it was then too late to raise the question of the personal disability of the party, and therefore that decision is altogether inapplicable in this ease.
In this I concur. Since the decision of this court in Livingston v. Story, (11 Pet., 351,) the law has been settled, that when the declaration or bill contains the neeessary averments of citizenship,. this court cannot look at the record, to see whether those averments are true, except so far as they are put in issue by a plea to the jurisdiction. In that case, the defendant-de-, nied by his answer that Mr. Livingston was a citizen of Hew York, as he had alleged in the bill. Both parties weñt into proofs. The court refused to examine1 those proofs, with reference to the .personal disability of. the plaintiff. This is the *590 settled law of the court, affirmed so lately as Shepherd v. Graves, (14 How., 27,) and Wickliff v. Owings, (17 How., 51.) (See also De Wolf v. Rabaud, 1 Pet., 476.) But I do- not understand this to be a rule which the court may depart from at its .pleasure. If it be a rule, it is as binding on the court'as on the suitors. If it removes from the latter the power to take any objection to the personal disability of a party alleged by the record to be competent, which is not shown by a plea to the jurisdiction, it is because the court are forbidden by law.to consider and decide on objections so taken. I do not consider it to be within the scope of the judicial power of the majority of the court to pass upon any question respecting the plaintiff’s citizenship in Missouri, save that raised by the plea to the juris■diction; and I do not hold any opinion of this court, or any court, binding, when expressed on a question not legitimately before it. (Carroll v. Carroll, 16 How., 275.) The judgment of this court is, that the case is to be dismissed for want of jurisdiction, because the plaintiff was not a citizen of Missouri, as he alleged in his declaration. Into that judgment, according to the settled course of this court, nothing appearing after a plea to the merits can enter. A great question of constitutional law, deeply affecting the peace and welfare of the country, is not, in my opinion, a fit subject to be thus reached.
But as, in my opinion, the Circuit Court had jurisdiction, I am obliged, to consider the question whether its judgment on the merits of the case.should stand or be reversed.
The residence of the plaintiff in the State of Illinois, and the residence of himself and his wife in the territory acquired from Erance lying north of latitude thirty-six degrees thirty minutes, and north of the State of Missouri, are each relied on by the plaintiff in error. As the residence in the terrirory affects the plaintiff’s, wife and" children as well as himself, I must in quire-what was its effect.
The general question may be stated to be, whether the plaintiff’s status, as a slave, was so changed by his reside ce within that territory, that he was not a slave in the State of Missouri,, at the time this action was brought.
In such cases, two inquiries arise, which maybe confounded, but should be kept distinct.
The first is, what was the law of the Territory into which the master find slave went, respecting the relation between them?
The second is, whether the State of Missouri recognises and allows the effect of that law of the Territory, 'on the status of the slave, on his return within its jurisdiction.
As to the first of these questions, the will of States and na *591 tions, by whose municipal law slavery .is not recognised, has been manifested in three different ways. ,
One is, absolutely to dissolve the relation, and terminate the rights of the master existing under the law of the country whence the parties came. This is said by Lord Stowell, in the cáse of the slave Grace, (2 Hag. Ad. R., 94,) and by the Supreme Court of Louisiana in the cpse of Maria Louise v. Marot, (9 Louis. R., 473,) to be the law pf France; and it has been the -law of several States of this Union, in respect to slaves in- . troduced under certain conditions. (Wilson v. Isabel, 5 Call’s R., 430; Hunter v. Hulcher, 1 Leigh, 172; Stewart v. Oaks, 5 Har. and John., 107.)
The second is, where, the municipal law of a country not recognising slavery, it is the will’of the State.to refuse the master all aid to' exercise any control over his slave; and if he attempt to do so, jn a manner justifiable only by that relation, to prevent the exercise of that control. But no law exists, designed to operate directly on -the relation of master and slave, and put an end to that relation. This'is said by Lord Stowell, in the case above mentioned, to be the law of England, and by Mr. Chief Justice Shaw, in the ease of the Commonwealth v. Aves, (18 Pick., 193,) to be the law of Massachusetts.
The third is, to make a distinction between the ease of a master and his slave only temporarily in the country, animo non manendi, and those who are there to' reside for' permanent or indefinite purposes. . This is said by Mr. Wheaton to be the law of Prussia, and was formerly the statute law of several States of our Union. It is necessary in this case to keep in' view-this .distinction between those countries whose laws, are designed to act' directly on the status of a slave, and make him a freeman, and those where his master can obtain no aid from the laws to enforce his rights. , ,
It is to the last case only that the authorities, out of Missouri,. ■ yelied .on by defendant, apply, when the residence in the non-slaveholding Territory was permanent. In the Commonwealth v. Aves, (18 Pick., 218,) Mr. Chief Justice Shaw said: “From the principle above stated, on which' a slave brought here becomes free, to wit: that he hecomes,entifled to the protection of our laws, it would seem to follow, as a necessary conclusion, that if the slave waives' the protection of those íáws, and returns to the State- where he is held as a slave, his condition is hot changed.” It- was Upon this ground, as is apparent from his whole reasoning, that Sir "William Scott "rests his opinion in the case of the slave Grace. To use one of his -expressions, .the effect' of the law of England was, to put the liberty of the slave into a . parenthesis. If there had beén an *592 act of Parliament declaring that a slave coming to England with his master should thereby be deemed no longer to be a slave, it is easy to see that the learned judge 'could not have arrived at the same conclusion. This distinction is very clearly stated and shown by President Tucker, in his opinion in the case of Betty v. Horton, (5 Leigh’s Virginia R., 615.) (See also Hunter v. Fletcher, 1 Leigh’s Va. R., 172; Maria Louise v. Marot, 9 Louisiana R.; Smith v. Smith, 13 Ib., 441; Thomas v. Genevieve, 16 Ib., 483; Rankin v. Lydia, 2 A. K. Marshall, 467; Davies v. Tingle, 8 B. Munroe, 539; Griffeth v. Fanny, Gilm. Va. R., 143; Lumford v. Coquillon, 14 Martin’s La. R., 405; Josephine v. Poultney, 1 Louis. Ann. R., 329.)
But if the acts of Congress on this subject are valid, the law of the Territory of Wisconsin, - within whose limits the residence of the plaintiff and his wife, and their marriage and the birth of one. or both of their children, took place,-falls under the first category, and is a law operating directly on the status of the slave. By the eighth section of the act of March 6, 1820, (3 Stat. at Large, 548,) it was enacted that, within this Territory, “slavery and involuntary servitude, otherwise than in the punishment of crimes, whereof-the' parties shall have been duly convicted; shall be, and is hereby, forever prohibited: Provided, always, that any person escaping ipto the same, from whom labor or service is lawfully claimed in- any State or Territory of the United States, such fugitive may be lawfully reclaimed, and conveyed to the person claiming his . or her labor or service, as aforesaid.”
By the act of April 20, 1836, (4 Stat. at Large, 10,) passed in the same month and year of the removal of the plaintiff to Port Snélling, this part of the territory ceded by Prance, where Fort Snélling is, together with- so much of the territory of the United States east of the Mississippi as now constitutes the State of Wisconsin,-was brought, finder a Territorial Government, under the name of the .Territory of Wisconsin. By the eighteenth- section of this -act, it was enacted, “ That the inhabitants of this Territory shall be entitled, to and enjoy all and singular the rights, privileges, and advantages, granted and secured to the people of the Territoiy of the United States northwest of the river Ohio, by the articles of compact contained in the ordinance for the government of said Territory* passed on the 13th day of July, 1787; and shall be subject to. all the restrictions and prohibitions in. said articles of compact, imposed npon the people of-the said- Territory.” ^ The sixth article of that compact is, “ there shall be neither, slavery-nor involuntary servitude in the said Territory, otherwise than in *593 the punishment of crimes, whereof the party shall have been duly convicted. Provided, always, that any person escaping into the same, from whom labor or service is lawfully claimed in any one of the original States, such fugitive maybe lawfully reclaimed, and conveyed to the person claiming his or her labor or service,- as aforesaid.” By other provisions of this act establishing the Territory 'of Wisconsin, the laws of the United. States, and the then'existing laws 6f the State of Michigan, are extended over the Territory; the latter being subject to alteration and repeal by the legislative power of the Territory created by the act.
■ E’ürt Snelling was within the Territory of "Wisconsin, and these laws were extended oyer it. The Indian title to 'that site for a military post had been acquired from the Sioux nation as early as September 28,1805, (Am. State Papers, Indian Affairs, vol. 1, p. 744,) and until the erection of the Territorial Government, the persons at that post were governed by the rules and articles of war, .and= such laws of the United States,: including the eighth section of the act of March 6, 1820, prohibiting-slavery, .as were applicable to .their ^condition; but after the erection of the Territory, and the extension of the laws of the- United States, and the laws of Michigan over the whole of the Territory, including' this military post, the persons residing there were under the'dominion of those laws in all particulars to which the rules and articles of war did not apply. . '
It thus appears that, by these acts of Congress, not only was a general system of municipal law borrowed from the State of Michigañj which did not tolerate slavery, but.it was positively enacted that slavery and involuntary servitude, with only one exception,'specifically described, should not exist there. It is .not simply that slavery is n,ot recognised and cannot be aided by th¡e municipal law. It is recognised for the purpose of being absolutely prohibited, and declared incapable of existing-within the Territory, save in the instance of'a fugitive slave.-- • ■ '
• It would' not be easy for the Legislature .to employ more-explicit language to signify its will' that the status of slavery-should not exist within the Territory, than the words found in ■ the act of 1820, and in the ordinance of 1787; and if áñy'doubt could .exist concerning their application , to cases, of masters coming into the Territory, with their slaves to reside, that doubt must yield to the inference required by the. words of exception* That exception" is,' of cases of. fugitive slaves. An exception from a prohibition marks the extent of.the prohibition; for it would be absurd, as well-as useless, to except, from a prohibit ■ *594 tion a case not contained within it. (9 Wheat., 200.) I must conclude, therefore, that it was the will of Congress that the state of involuntary servitude of a slave, coming into the Territory with his master, should cease to exist. The Supreme Court of Missouri so held in Rachel v. Walker, (4 Misso. R., 350,) which was the case of a military officer going into the Territory with two slaves..
.But it is a distinct question, whether the law of Missouri recognised and allowed effect to the change wrought in the status of the plaintiff, by force of' the laws of the Territory of Wisconsin.
I say the law of Missouri, because a judicial tribunal, in one-. State or nation, can recognise personal rights acquired by force of the law of any other State or nation, only so far as it is the law of the former State that those rights should be recognised. But, in the absence of positive law to the contrary, the will Of every civilized State must be presumed to be to allow such effect to foreign laws as is in accordance with the settled rules of international law. And legal tribunals are bound to act on this presumption. It may be assumed that the motive of the State in allowing such operation to foreign laws is what hqs been termed comity. But, as has justly been said, (per Chief Justice Taney, 13 Pet., 589,) it is the comity of the State, not ■of the court. The judges have nothing to do with the motive ■of the State. Their duty is simply to ascertain and give effect to its will. And when it is found by them that its will tó de-; part from a rule of international law has hot been mainfested by the State, they are bound to assume that its will is to give effect to it. Undoubtedly, every sovereign State may refuse ■to recognise a change, wrought by the law of a foreign State, on the status of a person, while within such foreign State, even 'in eases where the rules 'of international law require that recognition. Its will to refuse such-recognition may be manifested by what we term statute law, or by the customary law of the. State. It is within the province of its judicial tribunals to inquire and adjudge whether it appears, from the statute or cus-tomary law of the State, to be the will of the State to refuse to recognise such changes of status by force of foreign lay, as the •rules of the law of nations require to be recognised. But, in my-opinion, it is not within the province of any judicial tribunal to refuse such recognition from any political considerations, or any view, it may take of the exterior political relations be-. ' tween the State and one or more foreign States, or any im- . pressions it may have that a'change of foreign opinion- and action on the subject of slavery may afford a reason , why the. State -should change its own action. ‘ To understand and- give *595 just effect to such.- considerations, and to, cliange the action of . the State in consequence of them, are functions of diplomatists and legislators, not of judges.
The inquiry to he made on this part of the case is, therefore,whether the State of Missouri has, by .its statute, or its customary law,.manifested it's will to displace any rule of international law, applicable to a change of the status of a slave, by foreign law.
I have not heard it suggested that there was any statute of the State of Missouri bearing oh this question. The customary law- of Missouri is the common .law, introduced by. statute in 1816. (1 Ter. Laws, 436.) And the common law, as Blackstone says, (4 Com., 67,) adopts, in its full extent, the law of nations, and holds it to be a part of the law of .the land.
I know of no sufficient warrant for declaring that any rule of international law, concerning the recognition, in that State, of a change of status, wrought by an extra-territorial law, has been displaced or varied by the will of the State of Missouri.
I proceed then to inquire what the rules of international law prescribe concerning the change of status of the plaintiff wrought by the law of the Territory of "Wisconsin.
It is generally agreed by writers upon international law,, and the rule has been judicially applied in a great number of cases, that wherever any question may arise concerning the status of a person, it must be determined according to that law which has next previously rightfully operated on and fixed-that status. And, further, that the laws of a country do not rightfully operate up'on and fix the status of persons who are within its limits in Hiñere, or who are abiding there for definite temporary pur-' poses, as for health, curiosity, or occasional business; that these laws, known to writers on public and private international law as personal statutes, operate only on the inhabitants of the country. Not that it is or can be denied that each independent nation may, if it thinks fit, apply them to all persons within their limits. But when this is' done, not in conformity with .the. principles of international law, other States are not understoód to be willing to' recqgnise or allow- effect to such .applications of. personal statutes.
It becomes necessary, therefore, to inquire whether the operation of the laws of the Territory of Wisconsin upon the status o'f the plaintiff was or was not such an operation as these principles of international law require Other States to recognise a^d allow effect to.
. And this renders it needful to attend to the particular, facts and circumstances of this case. '
*596 ■It appears that, this ease came on for trial before the Circuit Court and a jury, upon an issue, in substance, whether the plaintiff,1 together with his wife and children, were the slaves of the defendant.
The court instructed the jury that, “upon 1,he ■ facts in. this case, the law is with the defendant.” This withdrew from the jury the consideration ,and decision of- every matter of fact. The. evidence án the case consisted of written admissions, signed by the counsel of the parties. If the case had been submitted .to-the judgment of the court, upon an agreed statement of facts, entered of record, in place of a special verdict, it would have been necessary for the court below, and for this court, to pronounce its judgment solely on those facts, thus agreed,, without inferring any other facts therefrom. 'By the rules of the common law applicable to such a case, and by force of the seventh article of the amendments of theiConstitution, this court is precluded from finding any fáct not agreed to by the patties on the record. Ho submission tó the court on a statement of facts was made. It was a trial by jury, in which certain admissions,' made by the parties, were the evidence. The jury were1 not only competent, but were ; bound to draw from that . evidence every inference which, in their judgment, exercised according to the rules of jaw, it would warrant. The Circuit Court took from the jury the power to draw any inferences from the admissions made by the parties, and decided the case for the defendant. This course can be justified, here, if at all, only by its appearing that upon the facts agreed, and all such' inferences of fact favorable to the plaintiff’s case, as the jury-might have been warranted in drawing from those, admissions, the law was with the defendant. Otherwise, the plaintiff would be deprived of the benefit of his trial by jury, by whom, for aught we can know, those inferences favorable to his case would have been drawn.
The material facts agreed, bearing on- this part, of the case, are, that Dr.' Emerson, the plaintiff’s master, resided about two years at the military post of Fort Snelling, being a surgeon in the army of the United States, his domicil of origin1 being Unknown; and what, if.anything, he-had done, to preserve or change'his domicil prior tó his residence at Rock Island, being also unknown.
How, it is true, that under some circumstances the residence 6f a military officer at a particular- place, in the discharge of his official duties, does not amount to the acquisition of a technical domicil.- But it cannot be affirmed, with correctness, that it never does. Theré being actual residence, and this. being presumptive evidence of domicil, all the circumstances *597 of the, ease must be considered, before a legal conclusion can be reached, that his place of residence is not ,his domicil. If a military officer stationed at a particular post should entertain an expectation' that his residence there would be indefinitely protracted, and in consequence should remove his family to the' place where his duties were to be discharged, form a permanent domestic establishment there, exercise there the civil rights and discharge the civil duties of an inhabitant, while he did no act and;- manifested no intent to have a domicil elsewhere, I think no one would say that the mere fact that he was himself liable to be called away by the orders of the Gov-erment would prevent his acquisition of a technical domicil at the plac’e of the residence of himself and his family. In other words,' I do not' think a,military officer incapable of acquiring a domicil. (Bruce v. Bruce, 2 Bos. and Pul., 230; Munroe v. Douglass, 5 Mad. Ch. R., 232.) This being so, this case stands thus: there was evidence before the jury that Emerson resided about two years at Fort SneHing, in the Territory of Wisconsin. This may or may not have been with such intent as to make it his technical domicilr The presumption is that it was. It is so laid down by this court, in Ennis v. Smith, (14 How.,) and the authorities in support of the position are there referred to. His intent was a question of fact for the jury. (Fitchburg v. Winchendon, 4 Cush., 190.)
The ease was taken , from the jury. If they had power to find that the presumption of the necessary intent had not been rebutted, we cannot say, on this record, that Emerson had not his technical domicil at Fort Snelling. But, for reasons which I shall now proceed to, give, .1 do not deem it necessary in this case to determine the question of the technical domicil of Dr. Emersoh.
, It must be .admitted that the'inquiry whether the law of a particular country has rightfully fixed the status of a person, so that in accordance with the principles of international law that' status should be recognised, in other jurisdictions, ordinarily depends on the question whether the. person was domiciled in the country whose laws are asserted to have fixed his status.-Butj -in the United States, questions of this kind may arise, 'where an attempt to décide solely with reference to- technical -domicil, tested by the rules which are applicable to changes of places of abode from one country to another, would not be consistent with-sound principles. And, in my judgment,-this' is one of those cases.- . .
The residence of the plaintiff, who. was taken by his mastef, Dr- Emerson, a? a slave, from Missouri to the State of Illinois,. and thence to the Territory of Wisconsin, must be deemed to *598 have been for the time being, and until he asserted his own separate intention, the same as the residence of his master; and the inquiry, whether the personal statutes of the Territory were rightfully extended over the plaintiff, and ought, in accordance with the rules of international law, to he allowed to fix his status, must depend upon the - circumstances under which Dr. Emerson went into that Territory, asad reruained there; and upon the further question, whether anything was there rightfully done by the plaintiff to cause those personal statutes to operate on him.
• Dr. Emerson was an officer in the army of the United States. •He went into the Territory to discharge his duty to the United States. The place was out of the jurisdiction of any particular State, and within the exclusive jurisdiction of the United States. It does not appear where the domicil of origin of Dr. Emerson was, nor whether 'or not he had lost it, and gained another domicil, nor of what particular State, if any, he was a citizen. .
• On what ground can it he denied that all valid laws of the United States-, constitutionally enacted by Congress for the government of the Territory, rightfully extended over an officer of the United States and his servánt who went into the Territory to remain there for an indefinite length of time, to take part in its civil or military affairs ? They were not foreigners, coming from abroad. Dr.- Emerson was a citizen of the country .which had exclusive jurisdiction over the Territory; and not only a citizen, but he went there in á public capacity, in the service of the same sovereignty which made the laws. Whatever those, laws might be, whether of the kind denominated personal statutes, or not, so far as they were intended by the legislative will, constitutionally expressed, to .operate on him and his servant, and on the relations between them, they had a rightful operation, and no other State or country can refuse to allow that those laws might rightfully operate on the plaintiff and his servant, because such a refusal would be a denial , that the United States could, by laws constitutionally enacted, ■ govern their own servants, residing on their own Territory, over which the United States had the exclusive control, and in respect to which they-are an independent sovereign power. Whether the laws now in question were constitutionally enacted, I repeat once more, is a separate question. But, assuming that they were, and that, they operated directly on the status of the plaintiff, I consider that no other State or country'could question the rightful power of the United States so to legislate, or, consistently with the settled rules of international law, could refuse to recognise the effects' *599 of such legislation upon the status of their officers and servants, as valid: everywhere. _ ,
_ This alone would, in my apprehension, he sufficient to decide this question.
But there are other facts stated on thé record which should not he passed over. It is agreed- that, in the year 1836, the.plaintiff, while residing in the Territory, was married, with the consent of .Dr. Emerson, to Harriet, named in the declaration as his wife, and that Eliza and Lizzie were-the children of that marriage, the first named having been horn on the Mississippi river, north of the line of Missouri, and the other having be'en horn after their return to Missouri. And the inquiry is, whether, after the marriagé of the plaintiff in the Territory, with the consent of Dr. Emerson', any other State or cquntry can, consistently with the settled rules of international law, refuse to recognisé and treat him as a .free man, when suing for the liberty of himself, his wife, and the • children of that marriage. It is in reference to. his status, as viewed in other States and countries, that thé contract of marriage and the birth of children becomes strictly material. At the same time, it is proper-to observe that the female to whom he was married having been taken to the same military post.of Eort Snelling as a slave, and Dr. Emerson claiming also to be .her master at the time of her marriage, her status, and that of the children of the marriage, are also affected by the same considerations. ,
. If the laws of Congress governing the Territory of Wisconsin were constitutional and valid laws, thére can be no doubt these parties were capable of contracting a lawful marriage, attended with all the usual civil rights and obligations of that condition. In that Territory they were absolutely free persons, having full capacity to enter into the civil contract of marriage.
It is a principle of international law, settled beyond con,tror versy in England and America, that a marriage, valid by the law of the place where it was contracted,'; and- not in fraud of the law of .any other placed is-valid everywhere; and that no technical domicil at the place of the contract is necessary to make it so. (See Bishop on Mar. and Div., 125—129, where the cases are collected.)
If, in Missouri, the plaintiff were held to be a .slave, the validity- and operatipn of- his contract of marriage must be denied., 'He can have no legal rights; of course, not those of a husband and father. • And the same is true of his wife and ■ children. ’ The denial of his rights is. the denial of theirs. So that, though lawfully married in''the Territory,. when they came out of it, into-the State of Missouri, they were no longer *600 husband and wife; and a child of that lawful marriage, though horn under the same dominion where its parents contracted a lawful marriage, is not the fruit of that marriage, nor the child of its father, hut subject to the maxim,.partus scquiiur ventrem.
It must he borne in mind that in this caso there is no ground . for the.inquiry, whether it he the will of the State of Missouri not to recognise the validity of the marriage of a fugitive slave, who escapes into .a State or. country where slavery is not allowed;, and there contracts a marriage; ol\ the validity of such a marriage, where the master^ being a citizen of the State of Missouri, voluntarily goes with his slave, in itinere, into a State' or country which does not permit slavery to exist, and the slave there contracts marriage without the consent of his master; for in this case, it is agreed, Ur. Emerson did consent; and ÚQ further question can arise concerning his rights, so far as their assertion is inconsistent with the validity of the marriage. Kor do I know of any ground for the assertion that this marriage was in fraud of any law of Missouri. It has been held by this court, that a bequest of property by a master to his slave, by necessary implication entitles the slave to his freedom; because, only as a freeman could he take and hold the bequest. (Legrand v. Darnall, 2 Pet. R., 664.) It has also been held, that'when a master goes with his slave to reside for an indefinite period in a State where slavery is not tolerated, this operates as<an act of manumission ; because it is sufficiently expressive of the consent of the master that the slave should be free. (2 Marshall’s Ken. R., 470; 14 Martin’s Louis. R., 401.)
' What, then, shall we say of the consent of the master, that the slave may. contract a lawful, marriage, attended with, all the civil rights and duties which belong to that relation; that he may enter into' a relation which none but a free man can assume — a relation which involves' not only, -the rights and duties of the slave, but those of the other party to the contract, and of their descendants to the remotest generation ? In my judgment, there can be no more effectual abandonment of the legal rights of a master over his slave, than by the consent of the master that the slave should enter'into a contract of marriage, in a free State, attended by all the civil rights and . obligations which belong to that condition.
And any claim by Ur. Emerson, or any one claiming under him, the effect of which is to deny the validity of this marriage,?, and the lawful paternity of the children born from.it, wherever asserted, is, in my judgment, a .claim inconsistent with good faith and sound reason, as well as with the rules of international law. And I go further: in my opinion, a law of the State *601 of Missouri, which should thus annul, a marriage, lawfully contracted' by these parties while resident in Wisconsin, not' in fraud of any law of Missouri, or of any right of Dr. Emerson, who consented thereto, would be a law impairing the obligation of a contract, and within the .prohibition of the Constitution of the United States. (See 4 Wheat., 629, 695, 696.)
To avoid misapprehension on this important and difficult subject, I will state, distinctly, the conclusions at which I.have arrived. They are:
First. The. rules-of international law respecting the emancipation of slaves, by the rightful operation of the laws of another State or country upon the status of the slave, while resident in such foreign State or country, are part of the common law of Missouri, and have not been abrogated by any statute law of that State.
Second. The laws .of the United States, constitutionally enacted, which operated directly on and changed the status of a 'slave coming into the Territory of Wisconsin with his master, who went thither to reside for. an indefinite length of time, in ■ the performance of his duties as an officer of the United States, had a rightful operation on the status of the slave, and it is in conformity with -the rules of international law that this .change of status should be recognised everywhere.
Third. The laws of the United States, in operation in the Territory of Wisconsin at the time of the plaintiff’s residence there, did act directly on the status of the plaintiff, and change his status to that of a free man. .
Fourth. The plaintiff and his wife were capable of contracting, and, with the consent of Dr. Emerson, did contract a marriage in that Territory, valid under-its laws; ,and the validity of this marriage cannot be questioned in Missouri, save by showing that it was in fraud of the laws of that State, or 'of some right derived' from them ;■ which cannot be shown in this case, because the master consented to it.
Fifth. That the consent of the master that his slave, residing in a' country which does not tolerate slavery, may enter into a lawful .contract of marriage, attended with, the civil rights and duties which belong to -mat condition, is an effectual act of . emancipation. And the law does not enable Dr.^Emerson, or any-one claiming under- him, to assert a title to the married persons as islavfes, and thus destroy the obligation of the contract of marriage, and’ bastardize their issue, and reduce them to slavery. ,. ,
But fit is-insisted that the Supreme Court of Missouri has' . settled this case by its decision in Scott v. Emerson, (15 Missouri Reports, 576;) and that this decision is in conformity *602 with the weight of authority elsewhere, and with sound principles. If the Supreme Court of Missouri had placed its decision on the ground that it appeared Dr. Emerson never became - domiciled in the Territory, and so its laws could not rightfully operate on him and his slave; and the facts that he went there to reside indefinitely, as an officer of the United States, and that the plaintiff was lawfully married there, with Dr. Emerson’s consent, were left out of view, the decision would find support in other cases, and I might not be prepared to. deny its correctness. But the decision is not rested on this ground. The domicil of Dr. Emerson in that Territory is not- questioned in that decision; and it is placed-on a broad denial of the ■ operation, in Missouri, of the law of ány foreign State or country upon the status of a slave, going with his master from Mis- • sóuri into such foreign State or country, even though they went thither to b¿eome, and actually became, permanent inhabitants .of such foreign State or country, the laws whereof acted directly on the status of the slave, and changed his status' to that of a freeman. i
To the correctness of such a decision I cannot assent. In my judgment, the opinion of the majority of the court in that, case is in confliet'with its previous -decisions, with a great weight of judicial authority in other slaveholding States, and with fundamental. principles of private international law. Mr. Chief Justice Gamble,-in.his dissénting opinion in that case, said:
“I regard the question as conclusively settled by repeated adjudications of this court; and- if I doubted or denied the propriety of those decisions, I would not feel myself any more at liberty to- overturn them, than I would any other series of decisions^ by .which the law upon any other question had been settled. There is with me nothing in the law of slavery which distinguishes, it from the law on any other .subject, or allows any more accommodation to the. temporary excitements which . have gathered around it. ****** But in the /midst of all such excitement, it is proper that the judicial-mind, calm and self-balanced, should adhere to principle's established when there-was no feeling to disturb the view of the legal questions upon which the rights of parties depend.”
, “In this State, it has been recognised from the beginning of the Government as a correct position in law, that the master ' who takes his slave to reside in a State or Territory where sla- , very is prohibited, thereby emancipates his slave.” (Winney v. Whitesides, 1 Mo., 473; Le Grange v. Chouteau, 2 Mo., 20; Milley v. Smith, Ib., 36; Ralph v. Duncan, 3 Mo., 194; Julia v. McKinney, Ib., 270; Nat v. Ruddle, Ib., 400; Rachel v. Walker, 4 Mo., 350; Wilson v. Melvin, 592.)
*603 Chief Justice Gamble has also examined the decisions of the courts of other States in which slavery is established, and finds them in accordance with these preceding decisions of the Supreme Court of Missouri to which he refers.
It would be a useless parade of learning for me to go over the ground which he has so fully and ably occupied.
But it is further insisted we are bound to follow this decision. I do not think so. .In this case, it is to be determined what laws of the United States were in operation in the Territory of Wisconsin, and what was their effect on the status of the plaintiff. Could the plaintiff contract a lawful marriage there ? Does any law of the State of Missouri impair the obligation of that contract of marriage, destroy his rights as a husband, bastardize the issue of the marriage, and reduce them to' a state of slavery ?
These questions, which arise exclusively under the Constitution and laws of the United States, this court, under the Constitution and laws of the United States, has the rightful authority finally to decide. And if we look beyond these questions, we come to the consideration whether the. rules of international law, which are part of the laws of Missouri until displaced by some statute not alleged to exist, do or do not require the status of the plaintiff, as fixed by the laws of the Territory óf Wisconsin, to be recognised in Missouri. Upon such a question, pot depending on any statute or local usage, but on principles of universal jurisprudence, this court has repeatedly asserted it could not hold itself bound by the decisions of State courts, however great respect might be felt for their learning, ability, and impartiality. (See Swift v. Tyson, 16 Peters’s R., 1; Carpenter v. The Providence Ins. Co., Ib., 495; Foxcroft v. Mallet, 4 How., 353; Rowan v. Runnels, 5 How., 134.)
Some reliance has been placed on the fact that the decision in the Supreme Court of Missouri was between these parties, and the suit there was abandoned to obtain another trial in the courts of the United States.
In Homer v. Brown, (16 How., 354,) this court made a. decision upon the construction of a devise of ■ lands, in direct opposition to the unanimous opinion of the Supreme Court of Massachusetts; between the sanie parties, respecting the same subject-matter — -the claimant having becomenonsuit in the State court, in order tp bring, his action in the Circuit Court of the United States. I did not sit in that case, having been of counsel for one of the parties while at the bar; but, on examining the report of the argument of the counsel-for the plaintiff in error, T find they made the point, that this court ought to give effect to the .construction put upon the will by the State *604 court, to tKe end- that rights respecting lands may he governed .hy one law, and that the law of-the place where the lands are situated'; that they referred to the State decision of the case, reported in 3 Cushing, 390, and to many decisions of this court. But this court does-not. seem to. have considered the point of sufficient importance to notice it in their opinions. In Millar v. Austin, (13 How., 218,) ah action was brought by the endorsee of a written promise. The-quéstion was, whether it was negotiable under a statute of OMb. The Supreme. Court of that State having decided it was hot negotiable, the plaintiff became nonsuit, and.brought his' action in the Circuit Court of the United States. The decision of the Supreme Court of the State, reported'in 4 Ves., L. J., 527, was'relied on. This court unanimously held the paper to be negotiable. . ,
"When the decisions of the. highest court of a State are directly in conflict with, each other, it has'been repeatedly held, here, '-that the last decision is not'necessarily tó be taken as the rule. (State Bank v. Knoop, 16 How., 369; Pease v. Peck, 18 How., 599.)
To these considerations I desire to add, that it was not made -known tb 'the Supreme Court of Missouri, so far ás. appears,' that the plaintiff was married in "Wisconsin with the consent . of Dr. Emerson, and it is hot made known to "us that Dr. Em- . erson was a citizen of- Missouri, a fact to which that: court -. .. seem to haye attached .much importance.
. • Sitting here to administer the law between these parti.es, I db not feel at liberty to surrender, my own convictions of what the law requires, to the authority of the decision in 15 Missouri Reports..
I have thus fat assumed, merely for the purpose of the argument, that the laws of the United States,” respecting slavery in' this Territory, were constitutionally enacted by Congress. It 'remains; to inquire whether they are constitutional ana binding laws.' " , ■'
, In the argument of this part of the casé at bar, it was justly considered by all the-cbunsel to be necessary to ascertain'the . source-of -the power of Congress ovei -the territory-belonging to the United States.. Until this is ascertained, it is not possible to determine the extent, of that power.1; On the one side it Was maintaiñed that the Constitution contains, no express grant- of power to organize and govern what is now known to the laws' of the United States as a Territory. That whatever power of this;kind exists, is derived by implication; from the. capacity of the-United,States to hold and acqüire^territory out of the limits of any State, and the necessity-for its having some; government. •
*605 On the other side, it was insisted that the Constitution has not failed to make an express provision for this end, and that it is found in the third section of the fourth article of the Constitution'.
To determine which of these is the correct view, it is needful to advert to some facts respecting this subject, which existed when the Constitution was framed and adopted. It will he found that these facts not only shed much light on the question, whether the framers of the Constitution omitted' to make a provision concerning the power of Congress to organize and govern Territories, but they will also aid in the construction of any provision which may have been made respecting this subject.
Under the Confederation, the unsettled territory within the limits’ of the United States had been a subject of deep interest. Some of the States insisted that these lands were.within their chartered boundaries, and that they had succeeded to the title of the Crown to the soil. On the other hand, it was argued that the vacant lands, had been acquired by the United States, by the war carried on by them under a common G-overnment and for the common interest.
This dispute was further complicated by unsettled questions of boundary among several States. It not only delayed the accession of Maryland to the Confederation, but at one time seriously threatened its existence. (5 Jour. of Cong., 208,442.) Under the pressure of these circumstances,. Congress earnestly recommended to the several States a. cession of their claims and rights to-'-the United States. (5 Jour. of Cong., 442.) And before the. Constitution was framed, it had been begun. That by blew York'had been made'on the 1st day of March, 1781; that of Virginia on the 1st day of March, 1784; that of Massachusetts on the 19th day of April, 1.785; that of Connecticut on the 14th day of .September, 17.86; that of South Carolina on tbe 8th day of August', 1787, while the Convention for framing the Constitution was in session.
It is very material to observe,- in this connection, that each of these acts cedes, in terms, to the United States,, as well the jurisdiction as the soil.
;• It is'also equally important to note that, when the Constitution was framed and adopted, this plan of vesting in the United States^ for the commpn good, the great tracts .of - ungranted lands claimed by the several States, in which so deep an interest-was. felt, was yet incomplete. It remained for North Carolina and Georgia to cede their extensive and valuable claims. These were made, by North Carolina on the 25th day of February, 1790, and by Georgia on the 24th day of April, *606 1802. The terms of these last-mentioned cessions will , hereafter be noticed in another connection; hut I observe here that, each -of them distinctly shows, upon its face, that 'they were not only in execution of the general plan proposed by the Congress of the Confederation, but of a formed purpose of . each of these States, existing when. the. assent of their respective people was given to the Constitution :of the United States.
It appears, then, that when the Federal Constitution' was framed, and presented to the people of the. several States for their consideration, the unsettled territory was viewed as justly applicable .tothe,.co'mmon benefit, so far as it then''had or might attain thereafter a pecuniary value; and so far as it might become the'seat of new States, to be admitted into the Union upon an equal footing with the original States, And' also that the- relations of the United States to that unsettled territory were of. different kinds. The titles of the States of New York, Virginia, Massachusetts, Connecticut, and South Carolina, as well , of soil as of jurisdiction, had been transferred toú the United States. North Carolina and Georgia had not actually made transfers, but a confident expectation, founded on their appreciation of the justice of the general claim, .and fully justified by the results, was entertained, that these cessions would . be made. The ordinance of 1787 had made'provision for the .temporary, government of so much of the territory actually, ceded as lay nprthwe'st of the river Ohio.
, But it must have.been apparent,- both to the framers of the ■ Constitution and the people, of the several States who were. to act upon it, that the Government thus provided for, could ■ not continue, unless' the Constitution should confer, on. the United States the necessary-powers to continue it. That tern-' porary Government, under the ordinance, was to consist of certain officers, to be appointed by and ■ responsible to the Congress-of, the Confederation; their, powers .had been conferred and defined 'by the ordinance. So far as it provided for the temporary government of the Territory, it was an ordinary act of legislation, deriving its force from the legislative power of Congress, and depending for its vitality upon the continuance' of that legislative power. But the officers to be appoint-e.d for the Northwestern Territory, after the adoption -of the Constitution, must necessarily be officers of-the United States, ;and not of the Congress of the Confederation; appointed and commissioned by the President, and exercising powers derived from the United States under the Constitution..
' Such was the relation between the ..United States and the-Northwestern Territory, which all reflecting men must -have foreseen would exist, whe.n-the Government created by thé *607 Constitution should supersede that of the Confederation. That if the new Government should b'e without power to govern this Territory, it could not appoint and commission officers, and send them into -the Territory, to exercise there legislative, judicial, and executive power-; and that'this Territory, which was even then foreseen to be so importánt,.both .politically and financially, to all the existing States, must he left not only without the control of the General Government, in respect -to its future political relations to the rest of the States, but absolutely without any Government, save what its inhabitants, acting in their primary capacity, might from time to 'time create for themselves.
But this Northwestern Territory was not the only territory, the soil and jurisdiction whereof were then understood to have . been ceded to the United States. The cession by South Carolina, made in August, 1787, was of “all the territory included within the river Mississippi, and a line beginning at that part of the said river which is intersected by the southern boundary of North Carolina, and continuing along the said- boundary line until it intersects the ridge or chain of mountains which divides the Eastern from the Western waters; then to be continued along the top of the said ridge of mountains, until it intersects a Tine to be drawn due west from the head of the southern branch of the Tugaloo river, to the said mountains; .and thence to run a due west course tó the river Mississippi.”
It is true that by subsequent explorations it was ascertained that the source of the Tugaloo river, upon which the title 'of South Carolina depended, was so far to the northward, that' the transfer conveyed only a narrow slip, of land, about twelve miles wide, lying on the top of the ridge of-mountains, and extending from the northern boundary, of Georgiy, to the southern boundary of North Caroline.. But this was a discov-'eiy made long .after, the cession, and there can be no doubt that the State of South Carolina, in-making the cession, and the Congress in accepting it, viewed it as a transfer to‘the ’United States of the soil and jurisdiction of an extensive and important part of the unsettled territory ceded by the Crown of Great Britain by the-treaty of peace, though its quantity or extent then remained to be ascertained.*.
It must be remembered also, as has-been already stated, that not only was there a confident expectation entertained by thé *608 other States, that North Carolina and Georgia would complete the plan already so far executed by New York, Virginia, Massachusetts, Connecticut, and South Carolina, but that the opinion was in no small degree prevalent, that the just title to this “back country,” as it was termed, had vested in the United States by the treaty of peace, and could not rightfully be claimed by any individual State.
There is another consideration applicable to this part of the subject, and entitled, in my judgment, .to great weight.
The Congress of the Confederation had assumed the power not only to dispose of the lands ceded, but to institute Governments and make laws for their inhabitants. In other words, they had proceeded to act under the cession, which, as we have seen, was as well of the jurisdiction as of the soil. This ordinance was passed on the 13th of July, 1787. The Convention for framing the Constitution' was then in session at Philadelphia. The proof is direct and'decisive, that it was known to the Convention.* It is equally clear that it was admitted and understood not to he within the legitimate powers of the Confederation to pass this ordinance. (Jefferson’s Works, vol. 9, pp. 251, 276; Federalist, Nos. 38, 43;)
The importance of conferring on the new Government regular powers commensurate with the objects to be attained, and thus avoiding the alternative of a failure to execute the trust assumed by the acceptance of the cessions made and expected, or its execution by usurpation, could scarcely fail to be perceived. That it was in fact perceived, is clearly shown by'the Federalist, (No. 38,) where this very argument is made use of in commendation of the Constitution.
Keeping these facts in view, it may confidently be asserted that there is very strong reason to believe, before we examine the Constitution itself, that the necessity for a competent grant of power to hold, dispose of, and govern territory, ceded and expected to be ceded, could not have escaped the attention of those who framed or adopted the Constitution; and that if it did not escape their attention, it could not fail to be adequately provided for.
Any other conclusion would involve the assumption that a subject of the gravest national concern, respecting which the small States felt so much jealousy that it had been almost an insurmountable obstacle to the formation of the Confederation, and as to which all the States had deep pecuniary and political interests, and which had been so recently and constantly agita *609 ted, was nevertheless overlooked; or that suck a subject was not overlooked, bub designedly left unprovided for, tnough.it was manifestly a subject of common concern, which belonged, to the care of the General Government, and adequate provision for which could not fail to be deemed necessary and proper.
The admission of new States, to be framed out of the ceded territory, early1 attracted the attention of the Convention. "Among the resolutions introduced by Mr. Randolph, on the 29th of May, was one on this subject, (Res. No. 10, 5 Elliot, 128,) which, having béen affirmed in Committee of the Whole; on the 5th of June, (5 Elliot, 156,) and reported to the-Convehr tion on the 13th of June, (5 Elliot, 190,) was referred to the Committee of Detail, to prepare the Constitution, on the 26th of July, (5 Elliot, 376.) This committee reported an article for the admission of new States “ lawfully constituted or established.” Nothing was said concerning the powbr of Congress to prepare or form such States. This omission struck Mr. Madison, who, on the 18th of August, (5 Elliot, 439,).moved for' the insertion of power to dispose of the unappropriated lands’ of the United States, and to institute temporary Governments. for new States arising therein.'
■ On the 29th óf August, (5 Elliot, 492,) the report of the committee was taken up, and after debate, which exhibited'' great diversity of views concerning the proper mode of providing for the subject, arising out of the supposed diversity of interests of the large and small States, and betwéen .those which had and those which had not unsettled territory, but no difference of opinion respecting the propriety and necessity of some adequate provision for the subject, Gouverneur Moms, moved the clause as it stands ■ in the Constitution. This met with general approbation, and was at once adopted.. Thé whole section is as follows:
-“New States’ may be admitted by the Congress into this Union; but no new State shall be formed or erected within the-jurisdiction of any other State, nor any State .be formed by the junction of two or more States, or parts of States, without the consent of the Legislatures of the States concerned, as well as of Congress.
“The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States; and nothing % this; Constitution shall be so construed as to prejudice any claims-of the United States or any particular Statfe.”
That Congress has some powfer to institute temporaiy Governments over the territory, I believe all agree; and, if it be admitted that the necessity of some power to govern the tem- *610 ■ toiy of tbe United States could not and did not escape tbe attention of tbe Convention and tbe people, and that tbe necessity is §o great, that, in tbe absence of any express grant, it is strong enough to raise an implication of the existence of that power, it would seem to follow that it is also strong enough to afford material aid in construing an express grant of power respecting that territory; and that they-who maintain the existence of tbe power, without finding any words at all in which it is conveyed, should be willing to receive a reasonable interpretation of language of tbe Constitution, manifestly intended to relate to tbe territory, and to convey to Congress some authority, concerning it. ’
It would seem, also, that when we find tbe subject-matter of •the- growth and formation and admission of new States, and tbe disposal of tbe territory for these ends, were under consideration, ahd that some provision therefor was expressly made, it is improbable that it would be,,iii its terms, a grossly inadequate provision; and that an indispensably necessary power to- institute temporary Governments, and to legislate for tbe inhabitants of tbe territory, was passed silently by, and left to be deduced from the necessity of tbe case.
In the argument at the bar, great attention has been paid' to the meaning, of tbe word “ territory.”
Ordinarily, when the territory of a sovereign power is spoken of, it refers to that tract of country which is under the political jurisdistion of that sovereign power. Thus Chief Justice Marshall (in United States v. Bevans, 3 Wheat., 386) says: “What, then, is the extent of jurisdiction which a State possesses? We answer, without hesitation, the jurisdiction of a State is coextensive yrith its territory.” Examples- might easily be multiplied of this use of the word, but they are unnecessary, because it is familiar. But the word “territory” is not used in this broad, and general sense in this clause of the Constitution.
. At the time of the adoption of the Constitution, the'United States held, a great tract of country northwest. of the Ohio-; another tract, then of unknown extent, ceded by South Carolina; and a. confident expectation was -then entertained, and •afterwards realized, that they then were'or would become the owners of other-great, tracts, claimed by North Carolina and Georgia.- These ceded tracts lay within the limits of the Ignited States, and out of the limits of any particular State; and the cessions embraced the civil -and political jurisdiction, and so- much of the soil as had not- previously been granted to in-, .dividuals..
These words, “territory belonging, to the United -States,”' *611 were not used in the Constitution- to describe an abstraction, but to identify and apply to these actual subjects - matter then .existing and belonging to the United States, and other similar subjects which might-afterwards be acquired; and this being' so, all the essential qualities and incidents attending .such actual subjects are embraced within the words “territory belonging to the United States,” as fully as. if .each of those essential qualities and incidents had been specifically described. . . . ■ .
I say, the essential qualities and incidents. But in determining what were the essential qualities and. incidents of the subject with which they were dealing, we must take into consideration not only all the particular facts which were immediately before them, but the great consideration, ever present to the minds of those who; framed and adopted the Constitution, that they were making, a frame of government for the people of the United States and their posterity, under which they hoped the United States might be-, what they have now become, a great and powerful nation, possessing the power to make war and to conclude treaties, and thus to acquire territory. (See Cerré v. Pitot, 6 Cr., 336; Am. Ins. Co. v. Canter, 1 Pet., 542.) With these in view, I turn to examine the clause of the article now in question.
It is said this provision has no application to any territory save that then belonging to the United States. I have already shown that, when the Constitution was framed, a confident expectation was entertained, which was speedily realized, that North Carolina and Georgia would cede their claims to that great territory which lay west of those States. No doubt has been-suggested that the.first clause of this.same article, which 'enabled Congress to admit new States,, refers to and includes new States to be formed out of this territory, expected to be thereafter ceded by North Carolina and Georgia, as well as new States to be formed out of territory northwest of the Ohio, which then had been ceded by Virginia. It must have beet seen, therefore, that the same necessity would exist for an'authority to dispose of and make all needful regulations respecting this territory, when ceded, as existed for a like authority respecting territory which had been ceded.
.No reason has been suggested why any reluctance should have been felt, by the framers of the Constitution, to apply this provision to all the territory which might, belong to the United States, or why any distinction should have been made, founded on the accidental circumstance of the dates of the cessions a circumstance in no way material as respects the necessity for rules and regulations, or the própriety of conferring *612 on the Congress power to make them. And if we. look at the course of the debates in the Convention on this article, we shall find that the then unceded lands, so far from having been left out of view in adopting this article, constituted, in’ the minds of members, a subject of even paramount import anee.
Again, in what an extraordinary position would the limitation of this clause to territory then belonging to the United States, place the territory which lay within,the chartered limits of North Carolina and G-eorgia'. The title to that territory was then claimed by those States, and by the United States; their respective claims are purposely left unsettled by the express words of this clause; and when cession's were made by those States, they were merely of their claims to this terri-toiy, the United States neither admitting nor denying the validity of those claims; so that it was impossible then, and has ever since remained impossible, to know whether this territory did or did not then belong to the United States; and, consequently, to know whether it was within or without the authority conferred by this Clause, to dispose of and make rules and regulations respecting the territory of the United States. This attributes to the eminent men who acted on this subject a want of ability and forecast, or a want of attention to the known facts upon which they were acting, in which I cannot concur.
There is not, in my judgment, anything in the language, the history, or the subject-matter of this article, which restricts its operation to territory owned by the United States when the Constitution was adopted.
But it is also insisted that provisions of the Constitution respecting territory belonging to the United States do not apply to territory acquired by treaty from a foreign nation. This objection must rest upon the position that the Constitution did not authorize the Federal Government to. acquire foreign territory, and consequently ha3 made no provision for its government when acquired; or, that though the acquisition of foreign territory was contemplated by the Constitution, its provisions concerning the admission of new States, and the making of all needful rules and regulations respecting territory , belonging to the United States, were not designed to be applicable to territory acquired .from foreign nations.
.It is undoubtedly true, that at the date of the treaty of 1803, between the United States and France, for the cession of Louisiana, it Was made a question, whether the Constitution had conferred on the executive, department of the Government of the United States power to acquire foreign territory by a treaty.
*613 There is evidence that very' grave doubfsjtrá^'then entertained concerning the existence of this po'w;e?¿>'■■irmfc that there. was then a settled opinion in the executive and legislative branches of the Government, that this power did not exist, cannot be admitted, without at the .same time imputing to those who negotiated and ratified the treaty, and passed the laws necessary /to carry it into execution, a deliberate and known violation of their oaths to support the Constitution; and whatever doubts may then have existed, the question must now be •taken to have been settled. Eour distinct acquisitions of foreign territory have been made by as many different treaties, under as many different Administrations. - Six States, formed on such territory, are now in the Union. Every branch of this Government, during a period of more than fifty years, has participated in these .transactions. To question their validity now, is vain. As was said by Mr. Chief Justice Marshall, in the American Insurance Company v. Canter, (1 Peters, 542,) “the Constitution confers absolutely on the Government of the Union the powers of making war and of making treaties; consequently, that Government possesses the power of acquiring territory, either by conquest or treaty.” (See Cerré v. Pitot, 6 Cr., 336.) And I add, it also possesses the power of governing it, when acquired, not by resorting to supposititious powers, nowhere found described in the Constitution, but expressly granted in the authority to make all needful rules and regular tions respecting the territory of the United States.
There was to be established by the Constitution a frame of government, under which the people of the United States and their posterity were to continue indefinitely. Tq take one of its provisions, the language of which is broad enough to extend throughout the existence of the Government, and embrace all territory belonging to the United States throughout all time, and the purposes and objects of which apply to all territory of the United States, and narrow it down to territory belonging to the United States when the Constitution was framed, while at the same time it is admitted that the Constitution contemplated and authorized the acquisition, from time to time, of other and foreign territory, seems to me to be an interpretation as inconsistent with the nature and purposes of the instrument, as it is with its language;, and I can have no hesitation in re-, jecting it.
I construe this clause, therefore, as if it had. read, Congress shall have power to make all needful rules and regulations respecting those tracts of country, out of the limits of the several States, which the United States have acquired, or may hereafter acquire, by cessions, as well of the jurisdiction as of the *614 soil, so far as tbe soil may be tbe property of tbe party making tbe .cession, at tbe time of making it,
' It bas been urged that tbe words “rules and regulations ” - are not appropriate terms in which to convey authority to make law's for the government of tbe. territory.
But it m.ust be remembered that this is a grant of power to tbe Congress — that it is therefore necessarily a grant of power to legislate — and, certainly, rules and regulations respecting a particular subject, made by the legislative power of a country, can be nothing but laws. Nor do tbe particular terms 'employed, in my judgment, tend in any degree to restrict this legislative power. Power granted to a Legislature to. make all needful- rules and regulations respecting tbe territory, is a power, to pass all needful laws respecting it.
Tbe word regulate, or regulation, is several times used in tbe Constitution. It is used in tbe fourtb section of tbe first article to describe those laws of tbe States, which prescribe the times, places, and manner, of choosing Senators and Representatives; m tbe second section-of tbe fourth article, to designate the legislative action of a State on the subject of fugitives .from service, having a very close relation to tbe matter of óur present inquiry; in tbe second section of tbe third article, to empower Congress to fix tbe extent of tbe appellate jurisdiction of this court; and, finally, in tbe eighth section of the first article are tbe words,ci Congress shall have power to regulate-eommerce.”
It is unnecessary to describe the body of legislation which bas been enacted under this grant of power; its variety and extent are well known. But it may be mentioned, in passing, fbat under this power to regulate commerce, Congress bas .enacted a great system of municipal laws, and extended it over tbe vessels and crews of the United States on tbe high seas and in foreign ports, and even over citizens of tbe United States resident in China; and has established judicatures, with power to inflict even capital punishment within that country;
■ If, ’ then, this clause does contain a power to legislate. respecting tbe territory, what are the limits of that power?
To' this I answer; that, in common with all the other legislative powers, of Congress, it finds limits in the express prohibitions on Congress not to do certain things'; - that, in the exercise of the legislative power, Congress cannot pass an ex post facto law.-or bill -of attainder; and so in respect to each-of tbe other prohibitions contained in tbe Constitution.
' Besides-this, the. rules and regulations must be needful. But undoubtedly tbe question whether a particular rule or regulation be needful, must be finally determined by Congress itself. Whether a law be needful, is a legislative of political, *615 not a judicial, question. Whatever Opngress deems needful is so, under <the grant of power- ;
Nor am’ I aware that it has ever been questioned that laws' providing for the temporary government of the settlers on the public lands are needful, not only to prepare them for admission to the Unión as States, but even to- enable' the United States to dispose of the lands. ■ s ’
Without government and social -order, there can be' no property; for without law, -its- ownórship, its usé, and the power of disposing of it, cease io exist, in the sense in which those words are used and understood in all civilízéd States.
Since, then, this power was manifestly conferred to enable the United States to dispose of its public lands to settlers, and to admit them into the Union as States, when in the judgment of Congress they should be fitted therefor, since these were the needs provided for, since it is confessed that Government is indispensable to provide for those needs, and the 'power is, to-make all needful miles and regulations, respecting the territory, I cannot doubt that; this is a power to govern the inhabitants of the territory, by such laws as Congress deems needful, until they obtain admission as States.
Whether they should be thus governed solely by laws ,enacted by Congress, or partly by laws' enacted by legislative' power conferred by Congress, is one of those questions which' depend on the judgment of Congress — a question which of these is needful. ’ ■ _
But it is insisted, that- whatever other powers Congress may have respecting the territory of the United States, the subject of negro slavéry forms an exception.
The Constitution declares that Congress shall have power to make .“all needful rules and regulations” respecting the territory belonging to the United States. ' -
. ■ The assertion is, though the Constitution says all, it does not mdan all — though it says all, withont qualification, it means all except such as allow or prohibit slavery. ’ It cannot be doubted that it is incumbent on those who would' thiis introduce an exception not found.,in- the language of th& instrument, to exhibit, some solid . and satisfactory reason, drawn from the subject-matter or .the purposes and objects of-the clause, the context, or from other provisions, of the' "Constitution, showing that the words employed in this clause' are not to be understood'according to their clear, plain, and natural signification. - ;
The subject-matter is the territory-of the United States’ out of the limits of every State, and consequently under the exclusive power , of the .people of the United States. - .Their *616 will respecting it, manifested in tbe Constitution, can be subject to no restriction'. Tbe purposes -and objects of tbe clause were the enactment of laws concerning the disposal of tbe public, lands, and the temporary government of tbe settlers thereon until new. States should be formed. It will not be questioned that, when the Constitution of the United States was framed and adopted, the allowance and the prohibition of negro slavery were recognised subjects of municipal legislation; every State had in some measure acted thereon; and the only legislative act concerning the territory — the ordinance of 1787, which had then so recently been passed — contained a prohibition of slavery. The purpose and object of the clause being to enable Congress to provide a body of municipal law for the government of the settlers, the allowance or the prohibition of slavery comes within the known 'and recognised scope .of that purpose and object.
There is nothing in the context which qualifies the grant of power. The regulations must be “respecting the territory.” An enactment that slavery may or may not exist there, is a regulation respecting the territory. Regulations must be needful; but it is necessarily left to the legislative discretion to determine whether a law be needful. No other clause of the Constitution has been referred to at the bar, or has been seen by nie, which imposes any restriction or makes any exception concerning the power of Congress to allow or prohibit slavery in the territory belonging to the United States.
A practical construction, nearly contemporaneous with the adoption of the Constitution, and continued by repeated instances through a long series of years, may always influence, and in doubtful cases should determine, the judicial mind, on a question of the interpretation of the Constitution. (Stuart v. Laird, 1 Cranch, 269; Martin v. Hunter, 1 Wheat., 304; Cohens v. Virginia, 6 Wheat., 264; Prigg v. Pennsylvania, 16 Pet., 621; Cooley v. Port Wardens, 12 How., 315.)
In this view, I proceed briefly to examine the practical construction placed on the clause now in question, so far as it respects the inclusion therein of power to permit or prohibit slavery in the Territories.
It has already been stated, that after the Government of the United States was organized under the Constitution, the temporary Government of the Territory northwest of the river Ohio could no longer exisc, save under the powers conferred on Congress by the Constitution. Whatever legislative, judicial, or executive authority should be exercised therein could be derived only from the people of the United States under tlie Constitution. And, accordingly, an act vas passed on the *617 7th day of August, 1789, (1 Stat. at Large, 50,) which recites: “Whereas, in'order that the ordinance of the United States in Congress assembled, for the government Of the territory northwest of the river Ohio, may continue to have full effect, it is required that certain provisions should be made, so as to adapt the same to the present Constitution of the United States."” It. then provides fob the appointment by the President of all officers, who, by force of the ordinance, were to have been appointed by the Congress of the Confederation, and their commission in the manner required by thé Constitution; and empowers the Secretary of the Territory to exercise the powers of the Governor in case of the death or necessary absence of the latter.
Here is an explicit declaration of the will of the first Congress, of which fourteen members, including Mr. Madison, had been members' of the Convention which framed the Constitution, that the ordinance, one article of which prohibited slavery, “should continue to have full effect.” Gen. Washington, who signed this bill, as President, was the President of that Convention.
It does not appear to me to he important, in this connection, that that clause in the ordinance which prohibited slavery was one of a series of articles of what'is therein termed a compact. The Congress of the Confederation had no power to make such a compact, nor to act at all on the subject; and after what had been so recently said by Mr. Madison on this subject, in the thirty-eighth number of the Federalist, I cannot suppose that ae, or any others who voted for this bill, attributed any intrinsic effect to what was. denominated in the ordinance a compact between “the original States and the people and States in the new territory;” there being no new States-then in existence in the territory, with whom a compact could be made, and the few scattered inhabitants, unorganized into a political body, not being capable of becoming a party to a treaty, even if the Congress-of the Confederation had had power to make one touching the government of that territory.
I consider tie passage of this law to have been an assertion - by the first Congress of the power of the United Státes.to prohibit slavery within this part of the territory of the United States ; - for it clearly shows that slavery was thereafter, to he prohibited there, and it could be prohibited only by an éxer-tion of the power of the United States, under the Constitution; no other power being capable of operating' within that' terri-. tory after the Constitution took effect. -
On the 2d of April, 1790, (1- Stat. at Large, 106,) the first Congress passed an act accepting- a deed of cession by North *618 Carolina of that territory afterwards erected into the State'of Tennessee^ The fourth express condition contained in this deed of cession, after.providing that the inhabitants of the Territory shall be temporarily governed in the- same'..manner as those beyond the Ohio, is followed by these words: u Provided, always, that no regulations made or to he made by Congress shall tend to emancipate slaves.”
. This provision shows that it was then- understood Congress might make a regulation prohibiting slavery, and' that Congress might also allow it to continue to. exist in the Territory; and accordingly,- when, a few days later, Congress passed the act of May 20th, 1790, (1 Stat. at Large, .128,). for the government of the Territory south of the river Ohio, it provided, “ and the Government of the Territory south of the Ohio shall be similar to that now exercised in the Territory northwest of the Ohio, except so far as is otherwise provided in the conditions expressed in an act of Congress- of the present session, entitled, ‘An act to accept a cession of -the claims of the State of North Carolina to a certain district of western territory.'’ ” Under the Government thus established, slavery, existed until the Territory became the State of Tennessee.
' On the 7th of April, 1798, (1 Stat. at Large, 649,) an,act was passed to establish a Government in the Mississippi Territory in all' respects like that exercised in the. Territory-northwest of fhe Ohio, “excepting and excluding the last article of the ordinance made for the government thereof by the. late Congress, on the 13th day of July, 1787.” "When the limits of this Territory had been amicably settled with1 Georgia; -and the latter ceded all its claim thereto, it was one stipulation in the compact of cession, that the ordinance of July 13th,-1787,'.“ shall in all its parts extend'to the Territory contained in-the present act of cession,-that article only excepted which forbids slavery.” The Government of this Territory was subsequently established- and organized under the act of May 10th, 1800; but so much of the ordinance as prohibited slavery was -not put in operation there. . . . . -
. . Without going minutely into the details of each case, L will . now give reference to two classes of acts, in one of which Congress has extended the ordinance of 1787, including the article prohibiting slavery, over different Territories, and thus exerted its power to prohibit it; in the other, Congress has erected Governments, over Territories acquired from France and Spain, in which- slavery already existed, but refused to apply- .to them that part Q.f the Government under the ordinance, which -excluded slavery;.-
v'jQf-the.first class- are the act of May 7th, 1800, (2 Stat. at *619 Large, 58,) for the government of the Indiana Territory; the act of January 11th, 1805, (2 Stat. at Large, 309,) for the government of Michigan Territory; the act of May 3d, 1809, (2 Stat. at Large, 514,) for the government of the Illinois Territory; the act of April 20th, 1836, (5 Stat. at Large, 10,) for the .government of the Territory of "Wisconsin; the act of June 12th, 1838, for the government of the Territory of IowS; the act of August 14th, 1848, for the government of the Territory of Oregon. To these instances should be added the act of March 6th, 1820, (3 Stat. at Large, 548,) prohibiting slavery in the territory acquired from France, being northwest of Missouri, and north of thirty-six degrees thirty minutes north latitude*.
Of the second class, in which Congress refused to interfere with slavery already existing under the municipal law of France or Spaing and. established Governments by .which slavery was recognised and allowed, are: the .act of March 26th, 1804, (2 Stat. at Large, 283,) for the government of Louisiana; the act of March 2d, 1805, (2 Stat. at Large, 322,) for the government of the Territory of Orleans; the act of June 4th, 1812, (2 Stat. at Large, 743,) for the government of the Missouri Territory; the act of March 30th, 1822, (3 Stat. at Large, 654,) for the government of the Territory or Florida. Here are eight distinct instances, beginning with the first Congress, and coming down to the year 1848, in which Congress has excluded slavery from the territory of the United States; and six distinct.instances in. which Congress organized Governments of Territories ' by which slavery was recognised and continued, beginning also with the first Congress, and coming down to the year 1822. These acts were severally signed by seven Presidents of the United States, beginning with General Washin'gton, and coming regularly down as far as Mr. John Quincy Adams, thus in-eluding all who were in public life when the Constitution was adopted.
■ If the practical construction of the Constitution contemporaneously with its' going into effect, by men intimately acquainted with its history from their personal participation in. framing and' adopting it, and continued by them through. a .long series of acts of the gravest importance, be- entitled to weight in the judicial mind on a question of ^construction, it would seem to be. difficult to resist the force of the acts above adverted to.
It appears, however, from what has taken place at the bar, that notwithstanding the language of the Constitution, and the long line of legislative and exe.cutive.precedentsunder .it, three .different and opposite views are taken of the power of-Congress respecting slavery in the Territories; -
*620 One is, that though Congress can make a regulation prohibiting, slavery in a Territory, they cannot make a regulation allowing it; another is, that it can neither be established nor prohibited by Congress, but that the people of a Territory, when organized by Congres's, can establish or prohibit slavery; while the third is, that the Constitution' itself secures to every citizen who holds slaves, under the laws of any State, the indefeasible right to carry them into any Territory, and thére hold them as property.
No particular clause of the Constitution has been referred to at the bar in support of either of these views. The first seems to be rested upon general considerations concerning the social and moral evils of slavery, its relations to republican Govern? ments, its inconsistency with the Declaration of Independence and with natural right.
The second is drawn from considerations equally general, concerning the right of self-government, and the nature of the political institutions which have been established by the people of the United States.
While the third is said to rest upon the equal right of all citizens to go with their property upon the public domain, and the inequality of a regulation which would admit the property of some and exclude the property of other citizens; and, inasmuch as slaves are chiefly held by citizens of those particular States where slavery is- established, it is insisted that a regulation excluding slavery from á Territory operates, praeticafly, to make an unjust discrimination between citizens of different States, in respect to their use and enjoyment of the territory of the United States. .
With the weight of either of these considerations, when pre-. sented to' Congress to influence its action, this court has nd concern. Qne or the other may be justly entitled to guide or control the legislative judgment upon what is a needful regulation. The question here is, whether they are sufficient to authorize this court to insert into this clause of the Constitution an exception of the exclusion or allowance of slavery, not found therein, nor in any other part of that instrument. To engraft on. any instrument a substantive exception not found in it, must he admitted to be a matter attended with great diffi-. eulty. And the difficulty increases with the importance of the-instrument, and the magnitude and . complexity of the interests involved in its construction. To allow this to be doné with the Constitution, upon reasons purely political, renders its judicial interpretation impossible — because judicial tribunals, as such, .cannot decide upon political considerations; Political, reasons have not the. requisite certainty' tq. afford rules of. juv *621 ridical interpretation. They are different in different men. They are different in .the same men at different times. And when a strict interpretation of the Constitution, according to the fixed rules which govern the interpretation of laws, is abandoned, and the theoretical opinions of individuals are allowed to control its meaning, we have no longer a Constitution; ■we are under the government of individual men, who for the time being have power to declare what the Constitution is, according to their own views of what it ought to mean. "When such a method of interpretation of the Constitution obtains, in place of a republican Government, with limited and defined powers, we have a Government which is merely an exponent of the will of Congress; or what, in my opinion, would not be preferable, an exponent of the individual political opinions of the members of this court.
If it can be-shown, by anything in the Constitution itself, that when it confers on Congress the power to make all needful rules and regulations respecting the territory belonging to the United States, the exclusion of the allowance of slavery was excepted; or if anj^thing in the history of this provision tends to show that such an exception was intended by those who framed and adopted the Constitution to be introduced into it, I hold, it to be my duty carefully to consider, and to allow just weight to such considerations in interpreting the positive text of the Constitution. But where, the Constitution has said all needful rules and regulations, I must find something more than theoretical reasoning to induce me to say it did not mean all. »
There have been eminent instances in this court closely analogous to/this one, in which such an attempt to introduce an exception, not found in the Constitution itself, has failed of success.
By the eighth section of the first article, Congress has the power of exclusive legislation in all cases whatsoever within this District.
In the case of Loughborough v. Blake, (5 Whea., 324,) the question arose, whether Congress has power to impose direct taxes on persons and property in this District. It was insisted, that though the grant of power was in its terms broad enough to include direct taxation, it must be limited by the principle, that taxation and representation are inseparable. It would, not he easy to fix on any political truth, better established or more fully admitted in our country, than that taxation and representation must exist together. "We went into the war of the Revolution to assert it, and it is incorporated as fundamental into all American Governments. But however true and im *622 portant this maxim may be,:, it is not necessarily of universal application.' It was for the people of the United States,, who ordained the' Constitution, to decide whether it should' or should not be' permitted to operate within this District; Their decision wás- embodied in the words of the Constitution; and as that contained no such exception as would permit the maxim to operate in this District, this court, interpreting that language, held that the exception did not exist.
Again, the.Constitution confers on Congress power to regulate commerce with foreign nations. Under this, Congress passed' an act on the 22d of December, 1807,. unlimited in duration, laying an embargo on all ships and vessels in the. ports or within the limits and jurisdiction of the United States. No law of the United States ever pressed so severely upon particular States. Though the constitutionality of the law was contested with an earnestness and zeal proportioned to the ruinous effects which were felt from it, and though, as Mr. Chief Justice Marshall has said, (9 Wheat., 192,) “a want of acuteness in.discovering objections to a measure to which they felt the most deep-rooted hostility will not be.imputed to those who were'arrayed in opposition, to this,” I am not aware that the fact that it prohibited the use of a particular species of property, belonging almost exclusively, to citizens of a few States," and this indefinitely, was ever supposed to show that it was unconstitutional. Something much more stringent, as a ground of legal .judgment, was relied on — that the power to regulate commerce aid not include the, power to annihilate commerce. , -
' ■ But the decision was, that under the power to regulate commerce, the,power of Congress over the subject was restricted only by those exceptions and limitations contained in the Constitution ; and as neither the clause in question-, which was,- a general grant of power to regulate commerce, nor any other '.clause of the Constitution, imposed any restrictions as to the duration of an embargo, an unlimited prohibition of the use of the shipping of the country was within the power of Congress. On this subject, Mr. Justice Daniel, speaking for the court in the case of United States v. Marigold, (9 How., 560,) says: ‘‘ Congress are, -by .the Constitution, vested with the power, to regulate commerce with foreign nations; and however, at periods of high excitement, an .application, of - the terms .‘ to regulate commerce,* such as would embrace absolute prohibition,,-may have, been questioned; yét,Ysince thé passage of the embargo and non-intercourse laws, and the, repeated judicial sanctions these statutes have .received, it can scarcely at this.. day he open'to doubt, that eveiy subject falling legitimately *623 within- tbe sphere of commercial Regulation may be. partially Or wholly excluded, when either measure shall 'be demanded by the safety or the important interests of the entire nation. The power once conceded, it may operate on any and every subject of commerce to which the legislative discretion may apply it.”
If p.qwer to regulate commerce extends to. an indefinite prohibition of the use of all vessels belonging to citizens of the several States, and may operate, without exception, upon-every subject of commerce to which the legislative discretion may apply it, upon what grounds can 1 say that power to make all needful rules and regulations respecting the territory of the United States is subject to an exception of the allowance'¡or prohibition of slavery therein ? '
"While the regulation is one “respecting the territory,” while it is, in the judgment of Congress, “a needful regulation,” and is thus completely within the words of the grant, while no other clause of the Constitution can be shown, which requires t the insertion of an exception respecting slavery, and while the practical construction for a period of upwards of fifty years forbids. such an exception, it would,' in my opinion, violate -every' sound rule of interpretation to - force that exception into the Constitution upon the strength of abstract political reasoning, which we aré bound to .believe the people of the United States thought insufficient to induce them -to limit the power of Congress, because ‘what they have said contains no such limitation. . '
. Before I. proceed, further to - notice - some other'grounds of supposed objection to this power' of Congress, I desire to say, that if it were hot for my anxiety to insist upon, what I deem a correct exposition of the Constitution, if I looked only to the purposes of the argument, the source of the power of Congress - asserted in the- opinion of the majority of the -court would' answer- those purposes equally well. -For they admit .that Congress-has-power to Organize and govern'the Territories until they arrive at a suitable-condition for ádmission to the Union;' they adpait, also, that the kind of Q-overnment which shall thus, exist should be-regulated by the condition and wants of each ■Territory, -and",that jit .is necessarily committed,to the discretion of-'Congress .'to enact such laws-for that purpose as that’ discretion may dictate; and -no limit to that discretion has been. .-■shown,' or even suggested,' save’those -positive -prohibitions' to legislate, which aré found in.the-Constitution.. ; „ . . -
; I confesé myself, unable to pefeeive any- difference whatever between -my, own opinion of the. general extent of the power of. Congress and the- opinion of .the majority of the'court, sávé *624 that I consider it derivable from the express language of the Constitution, while they hold it to be silently implied from the power to. acquire territory. Looking at the power of Congress over the Territories, as of the extent just described, what positive prohibition exists in the Constitution, which restrained Congress from enacting a law in 1820 to prohibit slavery north of thirty-six degrees thirty minutes north latitude?
The only one suggested is that clause in the fifth article of the amendments of the Constitution which declares' that no person shall be deprived of his life; liberty, or property, without due process of law. I will now proceed to examine- the question, whether this clause is entitled to the effect thus attributed to it. It is necessary, first, to have a clear view of the nature and incidents of that particular species of property which is now in question.
Slavery, being contrary to natural right, is' created only by municipal law. This is not only plain m itself, and agreed by all writers on the subject, but is inferable from the Constitution, and has been explicitly declared by this court. The Constitution refers to slaves as “persons held to service in one State,' under the laws thereof.” Nothing can moré clearly describe a status created by municipal law. In Prigg v. Pennsylvania, (10 Pet., 611,) this court said: “The state of slavery is deemed to be a mere municipal regulation, founded' on and limited to the range of territorial laws.” In Rankin v. Lydia, (2 Marsh., 12, 470,) the Supreme Court of Appeals of Kentucky said: “Slavery is sanctioned by the laws of this State, and the right to hold them under our municipal regulations is unquestionable. But .we view this as a right existing by positive'law of a 'municipal character, without foundation in the law of. nature or the unwritten common law.” I am not acquainted with any case or writer questioning'the correctness of this doctrine. (See also 1 Burge, Col. and For. Laws, 738—741, where the authorities are cofleeted.)
The status of slavery is not necessarily always attended with the same ppwers on the part of the.master. The master is subject to the supreme power of the State, whose will controls his action towards his slave, and this control must be defined and regulated by the municipal law. In one State', as at one period of the Roman law, it may put the life of the .slave into the hand of the master; others, as those of the United States, which tolerate slavery, may treat the slave as a person,-when-the mas-: ter takes his life; ’ while in others, the law. may recognise á ■ right of the slave to be protected from cruel treatment, In other words, the status .of slavery embraces every condition, from that in which the slave is.known to the law simply as a *625 chattel, with no civil rights, to that in whioh he is recognised.' as a person for all purposes, save the compulsory power of directing and receiving the fruits of his labor.- Which of these conditions shall attend the status of slavery, must depend on the municipal law which creates and upholds it. .
And not only, must the. status of slavery, be created and measured by municipal law, but. the rights, powers, and obli-. gations, which grow out, of that status, must be defined, pro*-tected, and enforced, by such laws. The liability of.the master for the torts and crimes of his slave, and of third persons for assaulting or injuring or harboring or kidnapping'him, the forms and nxodes of .emancipation-and sale, their subjection to the debts of the,master, succession by death of the master, suits for freedom, the capacity of the slave'to be party toa suit, or to be a witness, with such police Regulations as have existed in all civilized'States where slavery has been tolerktedj aré among the subjects upon which municipal legislation becomes necessary when slavery is introduced.
Is, it; -conceivable that the Constitution, has conferred:.the" right ■ On every.citizen'to become a resident on the .territory of-the United States with .his slaves, .and there to hold then!'' as such, but has neither made nor provided for any municipal regulations which are essential to the existence of slavery? - ,.
Is it-not more rational to conclude-that they'who framed: and adopted the Constitution. Were aware that’persons held to-' service under the-laws-of á Státé, are property only to the extent and under.the conditions fixed by those laws; that:they-must cease to "be available as. property,- when , their owners* ’ voluntarily place them1 permanently within another.juriedic--. tion, where nó municipal laws on the .subject-of slavery exist;: and that, being aware of these' principles, and having skid!,' nothing' to .interfere - with' or; displace them, or to . - compel1 \ Congress to legislate in any particular manner on the subject,.- and .-.haying .-empowered Congress to make all needful rules' and regulations'respecting- the territory of the United States^ it was their' intention to' leave to .'the. discretion of Congress' what regulations, if any, should bé made concerning slavery therein ? Moreover, if the-right exists? whát are its limits,' and what'.are its conditions?-’;If'citizens of the United States . have''.the night to-take their;slaves to a Territory, and hold-them ..there as slaves, without regard to the laws' of the Territory,!',suppose* this'right is notto be restricted to'the citizens. 'of slaveholding States. • A citizen of a State which does not tolerate'slavery can hardly be denied the power of doing the sáin'e' .thjng. ■' And whát law of slavery does, either take with hiini to.the Territory? , If it bé said to be those laws respecting *626 slavery which existed in the particular State from which each slave last came, what an anomaly is this ? "Where else can wé find, under the law of .any civilized country, the power to introduce and permanently continue diverse systems of foreign municipal law, for holding persons in slavery? I say, .not merely to introduce, but permanently to continue, these anomalies. For the offspring of the female must be governed by the. foreign municipal laws to which the mother was. subject; and when any slave /is sold or passes by .succession On the death of the owner, there must pass with him, by a species of subrogation, and as a kind of unknown jus in re, the foreign municipal laws which constituted, regulated, and preserved, the status of the slave before his exportation. Whatever theoretical importance may be- now supposed to belong to the maintenance of such a right, I feel a perfect conviction that it would, if ever tried, prove to be as impracticable in fact,, as it is, in my judgment, monstrous in theory. ■
I consider the/assumption which lies at the basis of this theory to be unsound; not in its just sense, and when properly understood, but in the' sense which has been attached to" it. That assumption is," that the territory ceded by France was acquired for the equal benefit of all the citizens of the United States. Í agree' to the position.' But it "was acquired for their benefit in their collective, not their individual, capacities. It was acquired for their benefit, as an organized political sóciety, subsisting as “the people of the United States,” under the Constitution of the United States; to be administered justly and impartially,' and as nearly as’ possible for the equal benefit of every individual citizen, according-to the best judgment and disbretion. of the Congress; to whose power, as the Legislature' of the nation which acquired it, the people of'the United States have, committed, its administration. , Whatever individual claims may be founded on local circumstances, or sectional differences of-condition, cannot, in-my opinion,i be recognised in this court, without .arrogating to .the judicial, branch of the Government powers not committed to it; and which,- with all the unaffected respect I feel for it, when acting in its proper sphere, I .do not think it fitted to -wield.
Nor, in my judgment, will .the position, that a prohibition to bring 'slaves into a Territory deprives, any one of his property without due process of law, bear -examination.
Itmust .be remembered that this restriction on, the, legisla--five power is not peculiar to the Constitution'of the United States; it was borrowed from. Magna Gharta; was-brought to America by-our ancestors, 'as part of. their inherited liberties, ■ and lhas -existed in all the States, usually in the very words of *627 the great charter. It existed in every political community in America in 1787, when- the ordinance prohibiting slavery north and west, of the Ohio was passed.
And if a prohibition of slavery in a Territory in 1820 violated this principle of Magna, Charta, the ordinance of 1787 also violated it; and what power had, I do not say thé Congress of the Confederation alone, but 'the Legislature of Virginia, or the Legislature of any or all the. States of the Confederacy, to consent to such a violation?,, The .people of the States had conferred no such power. I think I may at least say, if; the Congress did then violate Magna Gharta- by the ordinance, no one discovered that violation.; Besides, if the prohibition upon all persons, citizens as well as others, to. bring slaves into a Territory, and a declaration that if brought they sha^ll be free, deprives citizens of their .property without'due process of láw, what shall we say of the legislation of many of the slavehold-ing States.which have enacted the same prohibition ? As early as October, 1778, a law was passéd in Virginia, that thereafter no slave should.be imported into that Commonwealth by pea or by land; and that every slave who should be imported should become free. A' eitizien of Virginia purchased in Mary-, land a slave who belonged to another citizen of .Virginia, and removed with the slave to Virginia. The slave" sued for her freedom,"and recovered it; as maybe seen inWilson w: Isabel, (5 Call’s R., 425.). See also Hunter v. Hulsher, (1 Leigh, 172;) ánd a similar; law has been' recognised as válid in Maryland, in Stewart v. Oaks, (5 Har. and John., 107.) I am not aware that such laws, .though they exist in many States, were ever supposed to be in conflict with the principié of Magna Charta incorporated into the State Constitutions. It was certainly understood by the Convention which framed the Constitution, ahd has been so understood ever since, that, under the power to regulate commerce, Congress could prohibit the importation of slavés; and the exercise of the- power was restrained till 1808.’ A citizen of the -United States owns .slaves in Cuba, and brings theni to the United States,^where they- are set free by the legislation .of Congress. Does this legislation deprive him of his" properly without due process of law? If so, what becomes .of the laws prohibiting the slave trade?- If not, how can-a.similar regulation respecting a Territory violate the fifth-amendment of the Constitution?
. .Some reliance' was placed by the defendant’s eounsel upon the fact that the prohibition of slavery, in this territory was in the words, “that slavery, &c., shall'be and is hereby forever prohibited.” But the insertion of the word forever can have no legal effect. Every enactment not expressly limited in its *628 duration continues,in force until repealed or abrogated by some competent power, and tbe use of tbe word “forever!’ can. give to tbe law no more durable operation. . Tbe argument' is, that Congress cannot so legislate as to bind tbe. future • States formed but of tbe' territory, and that in tbis instance it bas attempted to do so.- Of, tbe political reasons wbicb .may bave induced the • Congress to use these words, and which caused them to expect that subsequent' Legislatures would conform their action to the then general» opinion, of tbe country that it ought-to be permanent, tbis court cgn take, no cognizance. ", ,
However fit such considerations are to control the action of' Congress, .and however reluctant a statesman may be to disturb-what has.beén settled, every; law made by Congress may be-jepealed, and, saving private rights, and public rights gained by States, its repeal is subject to tbe absolute .will., of. the same power which enacted tit/ If Congress-had enacted that ; the crime o'f murder, committed in this Indian Territory, north of ' thirty-six,^degrees.thirty’:minutes,-by Or on any white man," should"/brewer’ be punishable with death, -it would seem to me ■an". insufficient-objection tó an indictment, found .While it was-' a Territory,' that "at some future day States might exist there, and so the law was invalid, because, by its;.terms, it was-to. continue in fbrOe forever. -Such an -objection rests- upon a-misapprehension ,of' the province and-power .of courts respecting the constitutionality of laws enacted by the Legislature.'■
If. the. Constitution prescribe one rule,, and-the law another- and different, rule, it is.- the' &uty...0f -courts.- to • declare-, that-the . Constitution, -', and, not, the law, • governs the ease before them forjudgiñent. -. -If .the law include.no case save thpse for-which the; Constitution.' has burnished a, different rule, or no ease which the, Legislature has the. p'pwer to govern, [then the law. can - have- no: .operation. If it includes, cases, which-dhe Legislature: has power .to' govern;, and concerning - which -the Constitution 'does- not- prescribe, a.different rule,, the- law goW erns those':cases, though- it. may,-in-its terms, attempt to.in- , elude others, ori ,-which it cannot "operate In; Other'words, this court cannot declare void an act of Congress which"con--stitutio.naily 'embraces some -cases;' though-other cases, -within its terms, are. beyond the control of". Congress* or. beyond ..the reach of that particular' ,ÍU\yj'.,- . If, therefore, Congress' had - power, tó make .a law .'excluding, slavery. from this territory, while under the exclusive., power , of -the United .States, the use of the word “forever” does not .invalidate the law,- so long-as Congress has.--the; exclusive .legislative power-.,in the . territory. ' ' "
*629 But it is further insisted that the treaty of 1803, between the United States and France, by wbicb this territory was acquired, has so restrained the constitutional powers of Congress, that it cannot, by law, prohibit the introduction of slavery into that part of this territory north and west of Missouri, and north of thirty-six degrees thirty minutes north latitude.
By a treaty with a foreign-nation, the United States may rightfully stipulate that the Congress will or will not exercise its legislative power in some particular manner, on some particular subject. Such promises, when made, should be voluntarily kept, with the most scrupulous good faith. 'But that a treaty with a foreign nation can deprive the Congress of any part of the legislative power conferred by the people, so that it no longer can legislate as it was empowered by the Constitution to do, I more than doubt.
The powers of the Government do and must remain .unimpaired. The responsibility of. the Government to a foreign nation, for the exercise of those powers, is quite another matter. That responsibility is to be met, and justified to the foreign nation, according to the requirements of the rules of public law; .but never upon the assumption’that the United States had parted with dr restricted any power of acting according to its own tree will, governed solely by its own. appreciation of its duty.
The second séction of the fourth article is, “ This Constitution, and the laws of the' United States which shall be made in pursuance thereof, and all treaties made or which shall be made under the authority of the United States, shall be the supreme law of the land.” ■ This has made treaties part of our municipal law; but it has not assigned to them any particular ■degree of authority, nor declared that laws so enacted shall be irrepealable. No- supremacy is assigned- to treaties over acts of Congress. That they are not perpetual, and must be in ' some way repealable, all' will agree.
If the President and'the. Senate alone possess thé power to repeal or modify a law'found in’ a treaty, inasmuch as they cap change or abrogate one-treaty only by making another in-Cdnsistent with the first, the Government of the United States could not act at all,, to-that effect, without the consent of some foreign Government. I do not consider, I am not aware it has ever been considere^, that the Constitution has placed our country in this helpless condition. The action of Congress in repealing the treaties with .France by the act of July 7th, 1798, (1 Stat. at Large, 578,) was in conformity with these views. In the case of Taylor et al. v. Morton, (2 Curtis’s Cir. Ct. R., *630 454,) I bad occasion, to consider this Subject, and I adhere tó the views there expressed..
If, therefore, it were admitted that the treaty between the United States and France- did contain an express stipulation that the United States ^ would not exclude slavery from so much of the ceded territory as is now- in question, this court could not declare that an act of Congress excluding it was. void by force of the treaty. "Whether or no a case existed sufficient to justify a refusal to execute such -a' stipulation, would not be a judicial, but a political and legislative question, wholly beyond the authority of this court to try and determine. It would belong'to diplomacy and legislation, and not to the administration of existing laws. Such a stipulation in a treaty, j¡o legislate or'not to legislate in a particular way, has been repeatedly held in this court to address itself to the political or the legislative power, by whose action thereon this court is bound. (Foster v. Nicolson, 2 Peters, 314; Garcia v. Lee, 12 Peters, 519.)
But, in my judgment, this treaty contains no stipulation in any manner affecting the action.of the United States respecting the territory in question. Before examining the language of the treaty, it is material to bear in mind that the part..of the ceded territory lying north of thirty-six degr'ées thirty minutes, and .west and north of the-present State of Missouri, wa,s then a wilderness, Uninhabited save by savages,' whose possessory title had-not then been extinguished.
It. is iinpossible for me. to conceive on what ground France could have advanced a claim, or could have desired tó advance a claim, to restrain the United States from maMng any rules and regulations respecting this, territory, "which the United States might think fit to make; and still, less can I conceive of any reason which would have induced the United States to yield to such - a claiml "It was to be expected- that France, would desire to make the change of sovereignty and jurisdiction as little burdensome as possible to the then, inhabitants of Louisiana, and might well exhibit even an anxious solicitude to protect their property and persons, and secure to them and their posterity their religiou's and political -rights; -and the United States, as a just Government,- might readily-accede ta. all proper stipulations ' respecting those who were -about. ,to have théir-allegiance transferred, -But what'.interest France could have in uninhabited territory, wh ch¿ in-the language.oí.-, the treaty, was to be transferred “forever, and in fuíl sovereignty, ”'tó the.United States, pr how the United'Btates'.pQuld.1. consent to allow a foréigh .nation -t,ó'interfere in its -purely , internal affairs, in which that' foreign nation had no concern *631 whatever, is difficult for me to conjecture. In my judgment, this treaty contains nothing of the Mud.
■ The third article is supposed to have á hearing on, the question. It is as follows: “ The inhabitants of the ceded, territory shall be incorporated in the Union of the United States, and admitted as soon as possible, according to the principles of the Federal Constitution, to the enjoyment of all the rights, advantages, and immunities, of citizens of the United States; an -at the mean time they shall be maintained and protected i u the enjoyment of their liberty, properly, and the, religion they profess.” ■ .
There are two views of this article, each of which,, I think, decisively shows that it was not intended to restrain the Congress from excluding slavery from that part of the ceded territory then uninhabitéd. The first is, that, manifestly, its sole object was to protect individual rights Of the then inhabitants of the territory. They.are to be “maintained and protected in the free enjoyment of their liberty, property, and the re-ligión they profess.” But this article does not sécure to them the right to go upon the public domain ceded by the treaty, either with or without their slaves. The right or power of doing this did not exist before or at the time the treaty was made. The French and Spanish Governments while they held the country, as well as the United States when they acquired it, always exercised the undoubted right of excluding inhabitants from the Indian country, and of determining when and on what conditions it should be opened to settlers. And a stipulation, that the then inhabitants of Louisiana should be protected in their property,'can have no reference to théir use of that property, where they had no right, under the treaty,.to go with it, save at' the will of the United States. If one who-was an inhabitant of Louisiana at the time of the treaty had. afterwards taken property then owned by hini, consisting. of fire-arms, ammunition, and spirits, and had gone into the Indian country north of thirty-six degrees thirty minutes, to sell them to the Indians, all must agree the third article of the treaty would not have protected him from indictment under the áet of Congress of March 30, 1802, (2 Stat. at Large, 139,) adopted and extended to this territory by the act of March 26, 1804, (2 Stat. at Large, 283.)
Besides, whatever rights were secured were individual rights. If. Congress should pass any law which violated such rights of -any individual, and those rights were, of such a character as not to be within the lawful control of.,Congress under the Constitution, that1 individual could complain, and the act of Congress, as to such rights of his, would be inoperative; but it *632 would be valid and operative as to all other persons, whose individual rights did not come under the protection of the treaty. Add inasmuch as it . does not appear that any inhabitant of Louisiana* whose rights were secured by treaty, had been injured, it would be wholly inadmissible for this court to assume, first, that -one or more, such cases may have existed; and, second, that if any did exist, the, entire law was void — not only as ío fió se cases, if any, in which it could not rightfully operate, hut as to all others, wholly unconnected with the treaty, in which' such law could rightfully operate.
Eat it is quite unnecessary, in my opinion, to pursue this inquiry further, because it clearly appears from the language of the article,' and it: has been decided by this court, that the stipulation was temporary, and ceased to’have any effect when the then inhabitants of the Territory of Louisiana, in whose behalf the stipulation was made, were incorporated into the Union. '
. -In the eases of New Orleans v. De Armas et al., (9 Peters, 223,) the question was, whether a title to property, which existed át the date of the treaty, continded to be protected by-the treaty after the State of Louisiana was - admitted to the - Unión. The ’ third article of the treaty was relied on. Mr. ,'Chief Justice Marshall said: “ This article obviously contemplates two objects. One, that Louisiana shall be admitted into •the Union as- soon as possible, on an equal footing with, the’ other States; and the other* that, till such admission, the inhabitants of the ceded, territory shall be protected in the free ;enjoyment pf their liberty, property, and religion. Had any one of these rights been violated while these stipulations con-’ tinuéd'in force, the individual supposing himself to be injured might have "brought his case into this court; under the twenty-fifth section of the judicial act. But this stipulation ceased to Operate .when Louisiana became a, member of the Union, and ■its inhabitants were “admitted to the enjoyment of all the rights, adyantages, and immunities, of citizens of the United States.
The cases of Chouteau v. Marguerita, (12 Peters, 507,) and Permoli v. New Orleans, (3 How., 589,) are in conformity with this view of. the treaty.
■ To convert this. temporary ¡.stipulation of the treaty, in behalf of..French subjects who then inhabited a small portion of Louisiana,,-into a permanent restriction upon, the power ,of Congress to regulate- territory'then uninhabited, and to assert ' that it pot only restrains Congress from affecting the rights' of, property'of . the then inhabitants, but enabled' them and all' ■other citizens, of. the United States to go into any part of the *633 .ceded territory with'their slaves, and hold them there, is a construction of this treaty so opposed to its natural meaning, and so far beyond its subject-matter and the evident design of the • parties, that I cannot assent to it. • In my opinion, this treaty has no bearing’on the present question.
For these reasons, l am of opinion that so much of the several acts of Congress as prohibited slavery and involuntary sel' vitude within that part of the "‘Territory of Wisconsin lying north of thirty-six degrees thirty minutes north latitude, ana .west of the river Mississippi, were constitutional and valid laws.
I have, expressed my opinion, and the reasons therefor, at far greater length than I could have wished, upon the different- questions on which I have found- it necessary to pass, to arrive at a judgment on the case at bar. These questions are numerous, and the grave importance-of some of them required ine to exhibit fulty-the grounds of my opinion. I have touch-jed no question which, in the view I have tqben, it was not absolutely necessary, for me to pass upon, to ascertain whether the judgment of the Circuit Court should stand or be reversed. I have avoided no*question on which the validity of that judgment depends, V* To-have done either more or less, would have been inconsistent with my views of my duty.
In my opinion, the judgment of the Circuit Court Bhould he reversed, andffhe cause remanded for a new trial.

 Note by Mr. Justice Curtis. This statement that some territory did actually pass by this cession; is taken from the opinion of the court, delivered by Mr. Justice "Wayne, in the case of Howard v. Ingersoll, reported in 13 How., 405. It is an obscure. matter, and, ’on some examination of it, I have been' led to doubt whether any .territory actually passed by this cession. But as the; fact is not important to the argument, I have not thought it necessary further to investigate it.

 It was published in a, newspaper at Philadelphia, in May, and a copy of it was sent by É. H. Lee to Gen. Washington, on the 15th of July. (See p. 261, Cor. of Am. Rey., vol. 4, and “Writings of Washington, vol. 9, p. 174.)